KATHLEEN G. PFEIFFER & another *vs.* JOSE S. S. SALAS.

Middlesex.    April 9, 1971. — June 30, 1971.

Present: SPIEGEL, REARDON, QUIRICO, & BRAUCHER, JJ.

*Doctor. Negligence,* Doctor. *Evidence,* Admissions and confessions. *Practice, Civil,* Charge to jury.

At the trial of an action for malpractice against an orthopedic surgeon, where an issue was whether an eighteen inch long stainless steel rod which the defendant had inserted in a femur of the plaintiff was too long and had caused an infection, a statement by the judge in his charge that the only testimony on that issue was testimony of the plaintiff's mother that the defendant had told her that the rod "was too long for the femur" overlooked testimony of the plaintiff that the defendant had told her that the rod was "two or three inches too long," and also testimony of the defendant that it was not "accepted medical practice to have the rod stick up two to three inches", and the judge's statement was error prejudicial to the plaintiff which was not cured by a subsequent instruction that it was the jury's recollection of the testimony which was conclusive. [98–99]

At the trial of an action for malpractice against a surgeon, it was for the jury to determine whether the defendant made certain statements which constituted admissions of liability. [99–100]

In an action for malpractice against a surgeon, where there was testimony of a statement by the defendant to the plaintiff's mother which could have been found to constitute an admission and the judge instructed the jury that it was for them "to determine . . . that the statement does not, as a matter of law, constitute an admission of fault," and a verdict was returned for the defendant, it was held that the instruction was misleading and was prejudicial to the plaintiff and entitled her to a new trial. [100–101]

TORT.   Writ in the Superior Court dated December 28, 1965.

The action was tried before *Dimond, J.*

*Benjamin Goldman* for the plaintiffs.

*Joseph L. Tauro* for the defendant.

QUIRICO, J.   This is an action of tort against a surgeon (defendant) for alleged malpractice in which Kathleen G. Pfeiffer (plaintiff)[1] seeks to recover for personal injuries sustained by her, and Ralph Pfeiffer, Jr., her father, seeks to recover for hospital and medical bills incurred by him.   The case was tried to a jury which returned verdicts for the defendant on the claims of both plaintiffs.   The case is before us on various exceptions taken by the plaintiffs to rulings by the judge during the presentation of evidence and to instructions which he gave to the jury.   We summarize the evidence to the limited extent necessary for the purposes of this decision.

On December 31, 1963, the plaintiff fractured her left leg in an accident.   She was taken to the Leonard Morse Hospital in Natick where the defendant, who was an orthopedic surgeon, took charge of her, operated on her leg, placed an eighteen inch long stainless steel Hansen-Street rod in the left femur and applied a cast to the leg.   The cast was removed on March 4, 1964.   On that date hospital personnel taught her how to use crutches and gave her rehabilitation exercises or therapy, and she left the hospital.   She continued to use crutches until the end of the school year that summer.

In late July and early August, 1964, the plaintiff's left hip became red, came to a head with a hole in the center and was draining.   Pus and stringy material came from the hole.   The defendant examined her at the Leonard Morse Hospital, took some of the material which was draining and had it tested in the hospital laboratory.   The test re-

---

[1] The plaintiff was born on August 9, 1947, and thus was a minor when this action was commenced by a writ dated December 28, 1965, describing the plaintiff as "a minor who brings this action by her father and next friend, Ralph Pfeiffer, Jr."

port includes the entries: "Organisms found, Hemolytic staphylococcus aureus. Resistant to penicillin."

The plaintiff was an inpatient at the same hospital from August 17 to August 26, 1964. During that period the defendant performed surgery on her left hip where it was draining, treated the infection, and applied three sutures. The hospital record includes the following: "A generous degree of elliptical incision was made removing the brownish indurated fibrofatty tissue component of the left hip wound. The drainage site was noted to involve the peri-trochanteric region of the greater trochanter from which the metallic cap of the femoral Hansen-Street rod was protruding. . . . Three silk stay sutures were utilized to diminish the dead space area." The surgery involved in the original insertion of the Hansen-Street rod had left a six inch scar on the plaintiff's hip. The surgery of August, 1964, for the infection, left a cavity at that point which is noticeable when the plaintiff sits down, and it left a cavity scar about six inches long and one and one-half inches wide.

In October, 1964, the plaintiff's left hip again started to redden and drain a reddish-yellow thick liquid in the area of the incision of August, 1964. She was again admitted to the Leonard Morse Hospital on October 27, and was discharged on October 30. The hospital record shows: "Preoperative Diagnosis: Metallic foreign body bursitis of the left hip due to fracture immobilization of femur with femoral rod. Postoperative Diagnosis: same. Operation: Removal of femoral rod. Date of operation: 10/28/64." This operation involved another incision along the existing scar, and it was again sutured. An X-ray taken on October 30 showed that there was solid healing of the plaintiff's left femur across the old fracture site. The plaintiff went to the defendant's office on November 4 and November 9, 1964, for removal of sutures.

Late on the evening of November 9, while the plaintiff was brushing her teeth, she heard a snap and blacked out. She was again taken to the Leonard Morse Hospital where X-rays were taken. They showed that the plaintiff had re-

fractured her left femur at the old site of fracture. On November 10, the plaintiff was transferred to the Peter Bent Brigham Hospital and was there treated by a doctor other than the defendant until her discharge on March 9, 1965. She was then confined to bed at home for a period and started to walk with crutches in April, 1965.

There was conflicting evidence on the question whether the defendant advised the plaintiff to use crutches at various times during the period that she was under his care. We do not summarize that evidence because it is not a factor in our decision of this case.

The defendant was called as a witness by the plaintiffs and he testified in part as follows: He could have treated the plaintiff's fracture by either of two methods. One was "the conservative method of traction," and the other was by the insertion of the Hansen-Street intramedullary rod. He used the latter method. The rods come in varying lengths and thicknesses. They may be cut with a hacksaw, but he did not cut the one he used. The rod he used was diamond shaped, about eighteen inches long and less than one-half inch thick. He made an incision at the fracture site and then drove the rod into the marrow of the femur upward until it went through the saddle of the greater trochanter. An incision was made in the skin at the upper end to permit the rod to protrude. After the lower end of the rod was driven up to the point of the fracture, it was then driven downward into the marrow of the part of the femur below the fracture. Good medical practice requires that it be driven down to the extent "that you don't have the end of the rod sticking up more than an inch and a half" above the saddle of the greater trochanter. It is not accepted medical practice to have the rod stick up two to three inches. The top end of the rod is anchored to the greater trochanter by use of an appropriate anchoring plate, and a cap is screwed on the top end of the rod. If you make the rod too long there will be irritation underneath the skin where the upper end of the rod sticks out of the saddle of the greater trochanter. If it sticks out three

inches you will get more irritation and will definitely get a bursitis which will become inflamed, redden, and eventually burst as in this case. Near the end of his testimony the defendant said: "Looking at another x-ray,[2] the rod is sticking up out of the saddle of the trochanter. You can see the edge of the bone with the saddle. In the x-ray the rod hides a portion of the saddle. The top part of the rod is called the cap. It should not stick up a couple of inches. I do not believe that it sticks up more than a couple of inches."

Testimony by the plaintiff and by her mother about alleged admissions made by the defendant play an important role in this case and in the exceptions before us. During the course of her direct testimony the plaintiff said that while she was in the hospital between August 17 and 26, 1964, for treatment of her infected and draining hip she asked the defendant what was causing the infection. She said he answered "that the rod was two or three inches up out of my — the head of my femur, the bone, and every time I walked, the metal would be rubbing back and forth and causing the irritation in the infection." On cross-examination she was asked what the defendant had said about the rod on that occasion. She answered that he had said "that the rod was two or three inches too long up out of my hip." It was then brought out that in a deposition given two years earlier the plaintiff had not used the words "the rod was too long" in describing that conversation. At this point in the trial a colloquy occurred over the question whether the plaintiff had previously used such words in her testimony, and in excluding a question in which counsel for the plaintiff assumed the plaintiff had testified that the defendant had made such a statement, the judge excluded it and told counsel, "That merits rebuke." This unfortu-

---

[2] Exhibit 16 included about thirty-eight negatives of X-rays taken of the plaintiff's left leg during her several confinements to the Leonard Morse Hospital. The record does not identify the particular X-ray about which the defendant was speaking in his quoted testimony. At least one of these negatives (identified as "KP") and a positive print made therefrom indicate by measurement that the upper end of the pin and the cap thereon extend from two to two and three-eighths inches above the saddle of the trochanter.

nately occurred in the presence of the jury. This same dispute over whether the plaintiff had so testified came to the surface again when counsel for the plaintiff so argued to the jury, and the judge stopped him and told the jury that the plaintiff had not so testified.

The plaintiff's mother who is a registered nurse testified that on August 8, 1964, she had a conversation with the defendant about the infection in her daughter's hip, and that he said: "that the infection, the irritation was caused by the rod in her bone — it was about two or three inches too long for the femur, and it rubbed every time she walked, and broke down the tissue, and subsequently the infection entered where the tissue broke down." The mother had given a deposition more than a year before she testified at the trial. Some questions and answers were read from that deposition relating to her conversation with the defendant. In those answers she had not attributed to the defendant the statement that the rod was too long. Some of the questions read from the deposition were limited in scope, and for that reason there may be doubt whether the answers given then were inconsistent with those given at the trial. It is not necessary to resolve that for the purposes of this decision.

With that summary of the evidence as a background, we shall now consider separately a number of the exceptions taken by the plaintiffs to the judge's instructions to the jury.

1. In speaking about the length of the Hansen-Street rod inserted by the doctor, the judge said: "[T]he only testimony that I recall which bears on this issue is the testimony of Mrs. Pfeiffer [the plaintiff's mother] that Dr. Salas said to her, I believe it was in the summer of 1964, that the pin was too long for the femur." This statement entirely overlooked the testimony by the plaintiff herself that the defendant had told her the rod was two or three inches up out of her femur, and that it was two or three inches too long up out of her hip. This was the same evidence about which there had been a disagreement between counsel and the

judge when the plaintiff was on the stand and when counsel for the plaintiff was making his final argument to the jury. The judge's statement also entirely overlooked the testimony of the defendant that good medical practice required that the rod not extend more than one and one-half inches above the saddle of the trochanter, and that it was not good medical practice to have it stick up two to three inches. When some of this additional evidence was called to the judge's attention he gave the jury the following additional instruction: "Finally, one thing I do want to make clear: to the extent there are open issues in the case — I have indicated what the open issues are — that your recollection of the testimony is conclusive, and if there is any variation between your recollection and anything I may have said which indicates my recollection, then it is your memory that controls."

A judge presiding over a trial by jury is not permitted to charge the jury with respect to matters of fact, but he "may state the testimony and the law." G. L. c. 231, § 81. He is not required to state the testimony, but he may do so in his discretion. "If a statement of the testimony is made by the judge, it should be fair and impartial." *Sawyer* v. *Worcester Consol. St. Ry.* 231 Mass. 215, 218. While much must be left to the discretion of the presiding judge in this regard, the manner in which it is exercised is subject to review and reversal in those infrequent cases in which it is apparent that it has resulted in the denial of a fair trial to a litigant. We think in this case, as we did in *Jaglenaski* v. *Andersen Coal Mining Co.* 214 Mass. 573, 578, that "it is to be presumed that the judge supposed he was rightly quoting the testimony, but it is clear that he was not," that in this respect his charge to the jury was misleading and prejudicial to the plaintiff, and that "the statement to the jury, in another part of the charge, that the jury are to act upon their understanding of the testimony and not upon that of the judge" did not cure the difficulty in this case.

2. Whether the defendant made the statements attributed to him by the plaintiff and her mother was a question of fact to be decided by the jury. The statements, if made, consti-

tuted admissions from which, in combination with the other evidence in the case, the jury could have found all of the necessary elements of legal liability for damages in some amount. *Leary* v. *Keith,* 256 Mass. 157, 158–159. *Tully* v. *Mandell,* 269. Mass. 307, 309. *Zimmerman* v. *Litvich,* 297 Mass. 91, 93–94. *Woronka* v. *Sewall,* 320 Mass. 362, 365–367. *Manzoni* v. *Hamlin,* 348 Mass. 770. The judge was therefore required to submit to the jury for decision the question whether the defendant made the alleged admissions and, if he did, what weight should be given to them.

Immediately after stating to the jury that the only testimony he recalled on the length of the pin was that of the plaintiff's mother, which we have discussed above, the judge instructed the jury as follows: "Now, if you should believe that testimony, you still have to then make the determination what it means. Did that mean, or is that to be regarded — and this is for you to determine — is that to be regarded as an admission of fault or negligence, or is it to be regarded as something else? I don't want to attempt to enumerate and discuss other possible interpretations, if there are any. *I merely instruct you, but it is for you to determine, that the statement does not, as a matter of law, constitute an admission of fault"* (emphasis supplied). How does that instruction finally leave the matter with the jury? Does it tell them that they are not required, as a matter of law, to find that the defendant's statement was an admission? Or does it tell them that, as a matter of law, they cannot find that it was an admission? In our view it sounds more like the latter, and as such it would be erroneous.

The primary purpose of instructions to a jury is to assist them in the discharge of their responsibility for finding the facts in issue and then in applying to the facts found the applicable rules of law to enable them to render a proper verdict. The instructions should be full, fair and clear as to the issues to be decided by the jury, the rules to be followed by the jury in deciding the facts, and the law they are to apply to the facts found. Instructions are not addressed to the lawyers in the case but to the jurors who are persons

of varying degrees of education and experience, drawn at random from the community and from all walks of life, but who are not trained in the field of law. The language used in instructing the jury must be appropriately chosen to be helpful to such a group. *Mahoney* v. *Boston Elev. Ry.* 271 Mass. 274, 278–280. *Bell* v. *Dorchester Theatre Co.* 308 Mass. 118, 123–124. *Cahalane* v. *Poust,* 333 Mass. 689. *Baglio* v. *New York Cent. R.R.* 344 Mass. 14, 18–20. *Commonwealth* v. *Freeman,* 352 Mass. 556, 562–564.

The plaintiffs were entitled to have the judge instruct the jury that if they found that the defendant made the statements attributed to him by the plaintiff and her mother, they were then permitted, though not required, to find further that such statements constituted admissions. The language used by the judge was not sufficiently clear to amount to such an instruction, and sounded more like an instruction to the contrary. The prejudice resulting therefrom to the plaintiffs entitles them to a new trial.

3. The plaintiffs have argued exceptions to several other parts of the judge's instructions to the jury.[3] Beyond noting that the instructions are of questionable accuracy, it is unnecessary to consider them further for the reason that they may not be a factor in the retrial of this case.

*Exceptions sustained.*

---

[3] These several instructions which seem to invade the province of the jury as the finders of facts are the following: "I further instruct you that there is no legally sufficient evidence in this case to justify you in concluding that the scars that Kathy has today were due to any negligence on the part of Dr. Salas. . . . Now, let's assume you might conclude that the pin was too long, and that this length was the result of negligence on the part of Dr. Salas: what consequences may you legally give to that? I instruct you that the only legal consequence that you can attach to that is the cleaning-out operation that took place in the Summer or August of 1964. I instruct you that there is no legally sufficient evidence that would justify you in concluding that the pin, if too long, was causally connected to the removal of the pin in October, late October of 1964."