CORETTA SCOTT KING, administratrix,[1] *vs.* TRUSTEES OF
BOSTON UNIVERSITY.

Suffolk. December 8, 1994. - April 12, 1995.

Present: LIACOS, C.J., ABRAMS, NOLAN, & LYNCH, JJ.

*Charity. Charitable Pledge. Bailment,* Personal papers. *Wills, Statute of.
Gift. Frauds, Statute of. Practice, Civil,* Instructions to jury.

Evidence at a civil trial was sufficient for the judge to submit the issue of a
charitable pledge to the jury, that is, the evidence was sufficient to sus-
tain a conclusion that a certain letter contained a promise to make a
gift and the evidence was sufficient to support a determination that any
promise found was supported by consideration or reasonable reliance.
[55-64]
A bailment of personal property, in combination with a letter stating the
bailor's intent to give a gift of the property to the bailee, was sufficient
evidence of the bailor's donative intent, upon which the bailee could
reasonably rely. [57-61]
The Statute of Frauds for contracts to make testamentary dispositions,
G. L. c. 259, § 5, was not applicable to a document that was not a
contract to make a will; moreover, even if the statute were applicable,
the document, signed by the promisor, stated all terms of an enforce-
able agreement and thus would satisfy the Statute of Frauds. [61-63]
At a civil trial, evidence supported the jury's conclusion that the actions of
a bailee in attending to and caring for the bailed property, which went
beyond the obligations assumed as bailee, constituted reliance or con-
sideration for the bailor's written promise to transfer the ownership of
the property, personal papers, to the bailee, a university, at some future
date or upon the bailor's death. [63-64]
At the trial of a civil action, the judge correctly instructed the jury on the
elements of a charitable pledge. [64-66]


CIVIL ACTION commenced in the Superior Court Depart-
ment on December 8, 1987.

The case was tried before *Barbara J. Rouse,* J.

[1] Of the estate of Martin Luther King, Jr.; and individually.

The Supreme Judicial Court granted an application for direct appellate review.

*Rudolph F. Pierce (Leonard H. Freiman* with him) for the plaintiff.

*Lawrence S. Elswit (Todd L.C. Klipp* with him) for the defendant.

ABRAMS, J. A jury determined that Dr. Martin Luther King, Jr., made a charitable pledge to Boston University (BU) of certain papers he had deposited with BU. The plaintiff, Coretta Scott King, in her capacity as administratrix of the estate of her late husband, and in her individual capacity, appeals from that judgment. The plaintiff sued BU for conversion, alleging that the estate and not BU held title to Dr. King's papers, which have been housed in BU's library's special collection since they were delivered to BU at Dr. King's request in July, 1964.

The case was submitted to the jury on theories of contract, charitable pledge, statute of limitations, and laches.[2] In response to special questions the jury determined that Dr. King made a promise to give absolute title to his papers to BU in a letter signed by him and dated July 16, 1964, and that the promise to give the papers was enforceable as a charitable pledge supported by consideration or reliance. The jury also determined that the letter promising the papers was not a contract. The jury accordingly did not reach BU's additional statute of limitations and laches defenses. The trial judge denied the plaintiff's motion for judgment notwithstanding the verdict or for a new trial. The plaintiff appealed. We granted the plaintiff's application for direct appellate review. We affirm.

I. *Facts.* In reviewing the judge's denial of the plaintiff's motion for directed verdict on the affirmative defense of charitable pledge, we summarize the evidence in a light

[2] Prior to trial, the trial judge allowed the plaintiff's motion for a directed verdict on the defendant's affirmative defenses of gift, gift of a future interest, and charitable trust. Because we conclude that the judgment should be affirmed, we do not reach these issues and other claims of trial error which are raised and argued in BU's cross appeal.

favorable to the nonmoving party, BU. *Young* v. *Atlantic Richfield Co.*, 400 Mass. 837, 841 (1987). In 1963, BU commenced plans to expand its library's special collections. Once plans for construction of a library to house new holdings were firm, the newly appointed director of special collections, Dr. Howard Gotlieb, began his efforts to obtain Dr. King's papers. Dr. King, an alumnus of BU's graduate school program, was one of the first individuals BU officials sought to induce to deposit documents in the archives.

Around the same time, Dr. King was approached regarding his papers by other universities, including his undergraduate alma mater, Morehouse College. Mrs. King testified that, although her late husband thought "Boston seemed to be the only place, the best place, for safety," he was concerned that depositing his papers with BU would evoke criticism that he was "taking them away from a black institution in the South." However, the volatile circumstances during the 1960s in the South led Dr. King to deposit some of his papers with BU pursuant to a letter, which is the centerpiece of this litigation and is set forth herewith:

"563 Johnson Ave. NE
Atlanta, Georgia
July 16, 1964

"Boston University Library
725 Commonwealth Ave.
Boston 15, Massachusetts

"Dear Sirs:

"On this 16th day of July, 1964, I name the Boston University Library the Repository of my correspondence, manuscripts and other papers, along with a few of my awards and other materials which may come to be of interest in historical or other research.

"In accordance with this action I have authorized the removal of most of the above-mentioned papers and other objects to Boston University, including most correspondence through 1961, at once. It is my intention

that after the end of each calendar year, similar files of materials for an additional year should be sent to Boston University.

"All papers and other objects which thus pass into the custody of Boston University remain my legal property until otherwise indicated, according to the statements below. However, if, despite scrupulous care, any such materials are damaged or lost while in custody of Boston University, I absolve Boston University of responsibility to me for such damage or loss.

"I intend each year to indicate a portion of the materials deposited with Boston University to become the absolute property of Boston University as an outright gift from me, until all shall have been thus given to the University. In the event of my death, all such materials deposited with the University shall become from that date the absolute property of Boston University.

> "Sincerely yours,
> "/s/ Martin Luther King, Jr."

At issue is whether the evidence at trial was sufficient to submit the question of charitable pledge to the jury. BU asserts that the evidence was sufficient to raise a question of fact for the jury as to whether there was a promise by Dr. King to transfer title to his papers to BU and whether any such promise was supported by consideration or reliance by BU. We agree.

II. *Evidence of an enforceable charitable pledge.*[3] Because the jury found that BU had acquired rightful ownership of

---

[3]The terms "subscription" and "pledge" are frequently used interchangeably. See, e.g., *Jordan* v. *Mount Sinai Hosp. of Greater Miami, Inc.*, 276 So. 2d 102 (Fla. Dist. Ct. App. 1973), aff'd, 290 So. 2d 484 (Fla. Dist. Ct. App. 1974); *Salsbury* v. *Northwestern Bell Tel. Co.*, 221 N.W.2d 609 (Iowa 1974); *Arrowsmith* v. *Mercantile-Safe Deposit & Trust Co.*, 313 Md. 334 (1988). See generally Annot., Lack of Consideration as Barring Enforcement of Promise to Make Charitable Contribution or Subscription — Modern Cases, 86 A.L.R.4th 241 (1991). We note that, because of the bailor-bailee relationship between the donor and charitable

the papers via a charitable pledge, but not a contract, we review the case on that basis. We note at the outset that there is scant Massachusetts case law in the area of charitable pledges and subscriptions.

A charitable subscription is "an oral or written promise to do certain acts or to give real or personal property to a charity or for a charitable purpose." See generally E.L. Fisch, D.J. Freed, & E.R. Schacter, Charities and Charitable Foundations § 63, at 77 (1974). To enforce a charitable subscription or a charitable pledge in Massachusetts, a party must establish that there was a promise to give some property to a charitable institution and that the promise was supported by consideration or reliance. *Congregation Kadimah Toras-Moshe* v. *DeLeo*, 405 Mass. 365, 367 & n.3 (1989), and cases cited therein.[4] See *In re Morton Shoe Co.*, 40 B.R.

---

institution, the transaction here technically is a charitable pledge. See R.A. Brown, Personal Property § 15.1, at 469 (3d ed. 1975) (defining a pledge as "a bailment of personal property to secure an obligation of the bailor").

[4]In *Congregation Kadimah Toras-Moshe* v. *DeLeo*, 405 Mass. 365 (1989), the Congregation sued the estate of a decedent who had made an oral gratuitous promise to give $25,000 to the synagogue. The Congregation planned to spend the $25,000 on renovation of a storage room in the synagogue into a library. The oral promise was never memorialized in a writing or consummated by delivery before the decedent died intestate. Noting that "[a] hope or expectation, even though well founded, is not equivalent to either legal detriment or reliance," *id.* at 366-367, we affirmed the judgment of the trial court that the oral charitable subscription was not enforceable because it was oral, not supported by consideration, and without evidence of reliance.

By requiring that a promise to make a charitable subscription be supported by consideration or reliance, we declined to adopt the standard for enforceable charitable subscriptions set forth in the Restatement (Second) of Contracts § 90 (1981). See *id.* at 368. Section 90 (1), as modified for charitable subscriptions by subsection (2), provides that, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person . . . is binding if injustice can be avoided only by enforcement of the promise . . . ." We noted that, although § 90 thus dispenses with a strict requirement of consideration or reasonable reliance for a charitable subscription to be enforceable, the official comments to the Restatement make clear that consideration and reliance remain relevant to whether the promise must be enforced to avoid injustice. *Id.* See *Arrowsmith* v. *Mercantile-Safe Deposit & Trust*

948 (Bankr. D. Mass. 1984) (discussing Massachusetts law of charitable subscriptions).

The jurors were asked two special questions regarding BU's affirmative defense of rightful ownership by way of a charitable pledge: (1) "Does the letter, dated July 16, 1964, from Martin Luther King, Jr., to [BU], set forth a promise by Dr. King to transfer ownership of his papers to [BU]?"; and (2) "Did [BU] take action in reliance on that promise or was that promise supported by consideration?" In determining whether the case properly was submitted to the jury, we consider first, whether the evidence was sufficient to sustain a conclusion that the letter contained a promise to make a gift and second, whether the evidence was sufficient to support a determination that any promise found was supported by consideration or reliance.

III (A). *Evidence of a promise to make a gift.* The plaintiff argues that the terms of the letter promising "to indicate a portion of the materials deposited with [BU] to become the absolute property of [BU] as an outright gift . . . until all shall have been thus given to [BU]," could not as a matter of basic contract law constitute a promise sufficient to establish an inter vivos charitable pledge because there is no indication of a bargained for exchange which would have bound Dr. King to his promise. The plaintiff asserts that the above-quoted excerpt (hereinafter, first statement) from the letter merely described an unenforceable "unilateral and gratuitous mechanism by which he might" make a gift of the papers in the future but by which he was not bound. In support of her position that Dr. King did not intend to bind himself to his statement of intent to make a gift of the papers he deposited with BU, the plaintiff points to the language which appears

*Co., supra* at 353-354 (rejecting argument that court should adopt Restatement [Second] of Contracts § 90 [2]); *Jordan* v. *Mount Sinai Hosp. of Greater Miami, Inc., supra* at 108 ("Courts should act with restraint in respect to the public policy arguments endeavoring to sustain a mere charitable subscription. To ascribe consideration where there is none, or to adopt any other theory which affords charities a different legal rationale than other entities, is to approve fiction").

above the promise to make gifts of the deposited papers that "[a]ll papers and other objects which thus pass into the custody of [BU] remain my legal property until otherwise indicated, according to the statements below." According to the plaintiff, because of Dr. King's initial retention of legal ownership, BU could not reasonably rely on the letter's statements of intent to make a gift of the papers. We do not agree.

The letter contains two sentences which might reasonably be construed as a promise to give personal property to a charity or for a charitable purpose. The first statement, quoted above, is that Dr. King intended in subsequent installments to transfer title to portions of the papers in BU's custody until all the papers in its custody became its property. The second statement immediately follows the first, expressing an intent that "[i]n the event of [Dr. King's] death, all . . . materials deposited with [BU] shall become from that date the absolute property of [BU]" (hereinafter, second statement). BU claims that these two sentences should be read together as a promise to make a gift of all of the papers deposited with it at some point between the first day of deposit and at the very latest, on Dr. King's death.

Before analyzing the first and second statements, we note the considerations governing our review. A primary concern in enforcing charitable subscriptions, as with enforcement of other gratuitous transfers such as gifts and trusts, is ascertaining the intention of the donor. See, e.g., *Fuss* v. *Fuss (No. 2)*, 373 Mass. 445, 449 (1977) ("The effect of a purported transfer will be determined by the design of the original transaction as understood by the principal actors"); *Stryker* v. *Kennard*, 339 Mass. 373, 377 (1959) ("It is familiar law that in construing a trust instrument the intention of the settlor must be ascertained from the entire instrument, giving due weight to all its language, considered in the light of the attendant circumstances known to the settlor at the time of execution. The intent ascertained in this manner must prevail unless a positive rule of law forbids"). If donative intent is sufficiently clear, we shall give effect to that

intent to the extent possible without abandoning basic contractual principles, such as specificity of the donor's promise, consideration, and reasonableness of the charity's reliance. *DeLeo, supra* at 368 n.5. In determining the intention of Dr. King as expressed in the letter and the understanding BU had of that letter, we look first to the language of the letter, in its entirety, but also consider the circumstances and relationship of the parties with respect to the papers.

(1). *First statement.* Regarding the first statement, the plaintiff contends that it is not a promise but a mere statement of intent to do something in the future. See, e.g., *Phoenix Spring Beverage Co.* v. *Harvard Brewing Co.*, 312 Mass. 501, 506 (1942) ("A promise made with an understood intention that it is to be not legally binding, but only expressive of a present intention is not a contract"). We might agree that the first statement could induce nothing more than a "hope or mere expectation" on BU's part, if the statement were considered in a vacuum. Cf. *Pappas* v. *Bever*, 219 N.W.2d 720, 722 (Iowa 1974) ("The language of the pledge form in this case, *standing alone,* shows nothing more than a statement of intention. There is no evidence the pledge was intended to be obligatory" [emphasis added]). However, our interpretation of that first statement is strongly influenced by the bailor-bailee relationship the letter unequivocally establishes between Dr. King and BU.

A bailment is established by "delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be." 9 S. Williston, Contracts § 1030 (3d ed. 1967), quoting *State* v. *Warwick*, 48 Del. 568, 576 (1954). See *Stuart* v. *D.N. Kelley & Son*, 331 Mass. 76, 77-78 (1954), quoting *D.A. Schulte, Inc.* v. *North Terminal Garage Co.*, 291 Mass. 251, 256 (1935) ("A bailment is essentially a consensual transaction arising out of a contract express or implied . . . and there must be an acceptance by the bailee of the goods forming the subject mat-

ter of the bailment before there can be any bailment"). The terms of the letter establish a bailment in which certain "correspondence, manuscripts and other papers, along with a few of [Dr. King's] awards" were placed in "the custody of [BU]." The bailed papers were to "remain [Dr. King's] legal property until otherwise indicated." By accepting delivery of the papers, BU assumed the duty of care as bailee set forth in the letter, that of "scrupulous care." *Stuart, supra* at 78, quoting *D.A. Schulte, Inc., supra* ("It is plain the law does not thrust upon one the liabilities of a bailee without his knowledge or consent, and equally obvious that while an acceptance may be implied the law will not infer such until there is something to show notice or knowledge of the alleged bailee that the goods are in fact in his possession").

Generally there will be a case for the jury as to donative intent if property allegedly promised to a charity or other eleemosynary institution is placed by the donor in the custody of the donee.[5] The bailor-bailee relationship established in the letter could be viewed by a rational factfinder as a security for the promise to give a gift in the future of the bailed property, and thus as evidence in addition to the statement in the letter of an intent of the donor to be bound. Fur-

---

[5]We do not suggest that bailment of property allegedly promised to a bailee-charity creates an irrebuttable presumption of donative intent on the part of the bailor. Nor do we suggest that we would weigh bailment more heavily than evidence that the parties agreed to conditions or terms of a bailment that express a lack of donative intent.

Intent is our primary concern and a bailment *may* be evidence of donative intent. However, a bailor and a bailee-charity may agree to a contractual bailment in terms that make clear that the bailed property is not being pledged as a future gift or that the bailed property may remain in the custody of the charity or become the charity's property only if certain conditions are met. Cf. *DeCicco* v. *Barker*, 339 Mass. 457, 458 (1959) ("It is generally held that an engagement ring is in the nature of a pledge, given on the implied condition that the marriage shall take place. If the contract to marry is terminated without fault on the part of the donor he may recover the ring"). In sum, we consider the terms of any valid express or implied agreement to determine intent. *Fuss* v. *Fuss (No. 2)*, 373 Mass. 445, 449 (1977) ("The effect of a purported transfer will be determined by the design of the original transaction as understood by the principal actors").

thermore, while we have been unwilling to abandon funda-
mental principles of contract law in determining the
enforceability of charitable subscriptions, see *DeLeo, supra*
at 368 n.4, second par. (declining to adopt Restatement
[Second] of Contracts rule that charitable subscriptions en-
forceable without consideration or reliance where justice so
requires), we do recognize that the "meeting of minds" be-
tween a donor and a charitable institution differs from the
understanding we require in the context of enforceable
arm's-length commercial agreements. Charities depend on
donations for their existence, whereas their donors may give
personal property on conditions they choose, with or without
imposing conditions or demanding consideration. *In re
Field's Will,* 15 Misc. 2d 950, 951 (N.Y. Surr. Ct. 1959),
modified, 11 A.D. 2d 774 (N.Y. 1960) ("Charitable sub-
scription agreements can rarely be regarded as part of a bar-
gaining agreement that provide for a *quid pro quo*"). In
combination with the letter and in the context of a disputed
pledge to a charity, the bailment of Dr. King's letters pro-
vided sufficient evidence of donative intent to submit to the
jury the questions whether there was a promise to transfer
ownership of the bailed property and whether there was con-
sideration or reliance on that promise.[6]

(2). *Second statement.* The parties agree that a testamen-
tary transfer of the papers by means of the July 16, 1964,

---

[6] The jury could have found on that evidence alone that the first state-
ment in the letter expressing an intent to give all papers in BU's custody to
it at some future date was not a mere statement of future intent when the
bailment relationship is considered. However, there was evidence in addi-
tion to the bailor-bailee relationship which justified submission of the spe-
cial questions on whether there was a charitable pledge to the jury. First,
there was evidence the papers would be appraised (for Dr. King's) tax
purposes. Second, as promised in the letter, Dr. King delivered additional
papers after the initial boxes of papers were delivered. This evidence could
be considered by a jury in determining whether Dr. King intended to be
bound by his promise. Thus, the trial judge did not err in submitting to the
jury the first special question on charitable pledge. There was evidence
which the jury could weigh in determining whether the statement of intent
to give a gift of portions of the papers was an expression of an intent to be
bound.

letter would be invalid because the letter did not comply with the Statute of Wills. G. L. c. 191, § 1 (1992 ed.) (requiring testamentary dispositions to be subscribed by two or more competent witnesses). However, "[t]he statute of wills . . . does not prevent an owner of property from stipulating by contract for the disposition of his property at the time of his death." *Hale* v. *Wilmarth*, 274 Mass. 186, 189 (1931). See *Roberts* v. *Roberts*, 419 Mass. 685, 690 n.7 (1995), quoting *National Shawmut Bank* v. *Joy*, 315 Mass. 457, 471 (1944). The parties dispute whether the statement of intent to transfer title on Dr. King's death comports with the Statute of Frauds for contracts to make testamentary dispositions. G. L. c. 259, § 5 (1992 ed.). General Laws c. 259, § 5, provides in relevant part: "No agreement to make a will of real or personal property or to give a legacy or make a devise shall be binding unless such agreement is in writing signed by the person whose executor or administrator is sought to be charged, or by some person by him duly authorized."

The plaintiff contends that the intent that BU have absolute title to the papers in its possession from Dr. King's death forward was a disposition effective on death of the donor and was invalid because it was not in conformity with the strict formalities imposed on contracts to make testamentary dispositions under G. L. c. 259, § 5. Although the letter was a writing signed by Dr. King, the plaintiff asserts that the second statement does not satisfy the Statute of Frauds because it did not contain all the terms of an enforceable agreement. We do not agree. The Statute of Frauds was not applicable because the letter was not a contract to make a will, but rather was a promise to give BU absolute title to all papers in its possession either at some future point in Dr. King's life or on his death.

BU argues that, even if the Statute of Frauds were to apply, the letter was a writing signed by the promisor and the evidence was sufficient to assure that the risk of fraud or deceit would not increase by enforcing the agreement. As we noted above, the first statement of intent to make gifts during his lifetime of the bailed papers could have been inter-

preted by the jury as a promise to give gifts on which BU reasonably relied or for which BU rendered consideration. The second statement that papers not yet transferred to BU but in its custody at the time of Dr. King's death could have been interpreted by the jury as a statement of the latest date on which Dr. King intended to make a gift to BU of the bailed property. Such an interpretation states all terms of an enforceable agreement. Thus, the Statute of Frauds governing contracts to make testamentary dispositions would be satisfied.

(B). *Evidence of consideration or reliance.* The judge did not err in submitting the second question on charitable pledge, regarding whether there was consideration for or reliance on the promise, to the jury. "It may be found somewhat difficult to reconcile all the views which have been taken, in the various cases that have arisen upon the validity of promises, where the ground of defence has been that they were gratuitous and without consideration." *Ives* v. *Sterling*, 6 Met. 310, 315 (1843). There was evidence that BU undertook indexing of the papers, made the papers available to researchers, and provided trained staff to care for the papers and assist researchers. BU held a convocation to commemorate receipt of the papers. Dr. King spoke at the convocation. In a speech at that time, he explained why he chose BU as the repository for his papers.

As we explained above, the letter established that so long as BU, as bailee, attended the papers with "scrupulous care," Dr. King, as bailor, would release them from liability for "any such materials . . . damaged or lost while in [its] custody." The jury could conclude that certain actions of BU, including indexing of the papers, went beyond the obligations BU assumed as a bailee to attend the papers with "scrupulous care" and constituted reliance or consideration for the promises Dr. King included in the letter to transfer ownership of all bailed papers to BU at some future date or at his death. *Trustees of Amherst Academy* v. *Cowls*, 6 Pick. 427, 431 (1828) ("It seems that an actual benefit to the promisor, or an actual loss or disadvantage to the promisee, will be a

King *v.* Trustees of Boston University.

sufficient consideration to uphold a promise deliberately made. Whether the consideration received is equal in value to the sum promised to be paid, seems not to be material to the validity of a note . . ."); *Ives, supra* at 317-319; *Ladies' Collegiate Inst.* v. *French,* 16 Gray 196, 202 (1860).

The issue before us is not whether we agree with the jury's verdict but whether the case was properly submitted to the jury. We conclude that the letter could have been read to contain a promise supported by consideration or reliance; "[t]he issue [of whether transfer of ownership to BU was transferred by way of a charitable pledge by Dr. King] was, therefore, properly submitted to the jury, and their verdicts, unless otherwise untenable, must stand." *Carr* v. *Arthur D. Little, Inc.,* 348 Mass. 469, 474 (1965) (evidence sufficient as matter of contract law to raise question of fact for jury as to existence of common employment).

IV. *Jury instructions.* In reviewing the instructions to a jury in a civil case, we are mindful of the purpose of the charge: "The primary purpose of instructions to a jury is to assist them in the discharge of their responsibility for finding the facts in issue and then in applying to the facts found the applicable rules of law to enable them to render a proper verdict. The instructions should be full, fair and clear as to the issues to be decided by the jury, the rules to be followed by the jury in deciding the facts, and the law they are to apply to the facts found. Instructions are not addressed to the lawyers in the case but to the jurors who are persons of varying degrees of education and experience, drawn at random from the community and from all walks of life, but who are not trained in the field of law. The language used in instructing the jury must be appropriately chosen to be helpful to such a group." *Pfeiffer* v. *Salas,* 360 Mass. 93, 100-101 (1971).

The judge instructed the jury on the elements of a charitable pledge as follows: "A charitable pledge is really another form of a contract. It is a promise by a person who is called the 'pledgor,' to give a specified sum of money or a specified property to a charitable institution or organization, called the 'pledgee.' Now that promise must be supported either by

consideration by the pledgee, that is the charitable organization, or by reliance on the part of the pledgee." The trial judge also instructed the jury on BU's burden of persuasion on its affirmative defense of charitable pledge: "Boston University must prove by a fair preponderance, first that Dr. King promised to transfer ownership of the Papers to [BU] and that [second], [BU] either relied on that promise of transfer of ownership or that [BU] supplied some consideration for that promise of transfer of ownership." Further, the jurors were instructed that "with respect to whether Dr. King promised to transfer ownership of his Papers to [BU], keep in mind that with respect to this legal theory, any promise made must be sufficiently specific, and it must be sufficiently specific so that any consideration given by the person to whom the promise is made, in this case, [BU], can specifically undertake to respond to that promise. The promise here is the transfer of ownership of his Papers to [BU]."

The plaintiff raises two challenges to the instructions on charitable pledge. The plaintiff argues that the judge erred in defining "promise" for the jury. According to the plaintiff, the judge's instruction, in response to the jury's request for a clarification of the difference between a statement of intention and a promise, that "a statement of intention without more is not a promise, but a statement of intention which binds the person who makes it to forbear from doing something or to do a certain specific thing, and which gives the person to whom the promise is made a right to expect or to claim the performance of some particular thing or act," improperly blurred the line between a statement of intent and a binding promise. We disagree. When we consider the instructions in their entirety, we think that the judge made clear, in language understandable to "persons of varying degrees of education and experience, drawn at random from the community and from all walks of life, but who are not trained in the field of law," *Pfeiffer*, *supra*, that "[a] promise made with an understood intention that it is to be not legally binding, but only expressive of a present intention, is not a contract," *Phoenix Spring Beverage Co.* v. *Harvard Brewing*

*Co.*, 312 Mass. 501, 506 (1942). The instructions defining a promise were not legally incorrect.

The plaintiff argues that the judge should have instructed the jury on certain specific facts of the case, i.e., to point to and characterize particular passages of the letter. The parties dispute whether the plaintiff's challenge on appeal to the trial judge's failure to instruct the jury on a specific passage in the letter ("All papers and other objects which thus pass into the cutody of [BU] remain my legal property . . .) properly was preserved by the plaintiff at trial. Because we agree that the plaintiff did not object to this aspect of the charge, we simply note that "[a] judge presiding over a trial by jury is not permitted to charge the jury with respect to matters of fact . . . ." *Pfeiffer*, *supra* at 99.

*Judgment affirmed.*