van Gestel, Allan, J.
In connection with the Fifth Report of the Special Master, Paper #43, and certain objections thereto, there has arisen a need for this Court to rule upon the interplay, if any, between the common law and two parts of the Massachusetts Uniform Commercial Code: G.L.c. 106, sec. 2-326; and G.L.c. 106, sec. 9-102(a)(20). Thus, this memorandum.

BACKGROUND

The setting in which the issue arises involves the sorting out of rights between and among individuals ensnared in the fraud flowing from the failure of Haley & Steele, Inc. (“Haley & Steele”), a Newbuiy Street art dealership. A substantial amount of valuable artwork, mostly 19th Century prints, in the possession of Haley & Steele, was seized by Century Bank & Trust Co. (the “Bank”) as a primary secured creditor of Haley & Steele.
In cooperation with the Bank and a number of individuals with claims against Haley & Steele involving the seized artwork to which they claim title, the Court appointed Camille F. Sarrouf, Esquire, as a Special Master. On October 17, 2005, Mr. Sarrouf submitted his Fifth Report. In that report, Mr. Sarrouf provided, among other things, findings and conclusions made after certain evidentiary hearings that he held in the latter part of September 2005. The findings established and identified five categories of claimants: (1) bailors; (2) bona fide purchasers; (3) consumer consignors; (4) commercial consignors; and (5) parties who did not fall within any of the foregoing categories. *205 It is the rights of those individuals characterized as consumer consignors, as opposed to general creditors, of Haley & Steele that are in issue here.
Individual customers of Haley & Steele delivered artwork, called “consigned goods,” for purposes of sale pursuant to documents entitled “consignment agreements.” Generally, these consignment agreements gave Haley & Steele the right to keep the artwork for various periods of time and to sell the artwork at usually agreed-upon amounts for agreed-upon commissions. Haley & Steele also undertook and was obliged under the consignment agreements to care for, insure and handle the artwork.

DISCUSSION

Prior to July 1, 2001, G.L.c. 106, sec. 2-326 read as follows:
(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is
(a) a “sale on approval” if the goods are delivered primarily for use; and
(b) a “sale or return” if the goods are delivered primarily for resale.
(2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer’s creditors until acceptance; goods held on sale or return are subject to such cldims while in the buyer’s possession.
(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making the deliveiy, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making the delivery until payment or resale or uses such words as “on consignment” or “on memorandum.” However, this subsection is not applicable if the person making delivery
(a) complies with the applicable law providing for a consignor’s interest or the like to be evidenced by a sign; or
(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or
(c) complies with the filing provisions of the Article on Secured Transactions (Article 9).
(4) Any “or return” term of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this Article (section 2-201) and as contradicting the sale aspect of the contract within the provisions of this Article on parol or extrinsic evidence (section 2-202).
In the 1999 amendments to the Uniform Commercial Code, G.L.c. 106, sec. 2-326 was rewritten, as were parts of Article 9. The amendments became effective in Massachusetts on July 1, 2001, and, thereafter, to date, sec. 2-326 now reads as follows:
(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is
(a) a “sale on approval” if the goods are delivered primarily for use, and
(b) a “sale or return" if the goods are delivered primarily for resale.
(2) Goods held on approval are not subject to the claims of the buyer’s creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer’s possession.
(3) Any “or return” term of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this Article (Section 2-201) and as contradicting the sale aspect of the contract within the provisions of this Article on parole or extrinsic evidence (Section 2-202).
Some of the creditors of Haley & Steele advocate for the application of sec. 2-326 to that artwork that was delivered to Haley & Steele which falls outside the definition of “consignment” contained in Article 9 of the Uniform Commercial Code. Others, including the Special Master, perhaps the Bank, and certain consumer consignors, contend that consignments of consumer goods are not considered Article 9 consignments, citing to the definitions in sec. 9-102(20). Sec. 9-102(20) reads as follows:
(20) “Consignment” means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
(A) The merchant:
(i) deals in goods of that kind under a name other than the name of the person making delivery;
(ii) is not an auctioneer; and
(iii) is not generally known by its creditors to be substantially engaged in selling the goods of others;
(B) with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;
(C) the goods are not consumer goods immediately before delivery; and
(D) the transaction does not create a security interest that secures an obligation.
Sec. 9-102(23) defines “consumer goods” to mean “goods that are used or bought for use primarily for personal, family, or household purposes.”
This Court concludes, and rules, that to the extent that those persons listed in the Special Master’s Fifth Report as “consumer consignors” — as opposed to “commercial consignors” — are persons whose goods *206 consisted of artwork that was used or bought for use primarily for personal, family, or household purposes immediately before delivery to Haley & Steele, then their artwork falls outside of the “consignment” defined in sec. 9-102(20).
This conclusion results from a reading of the plain language of the statute, which is, of course, the Court’s obligation. The Supreme Judicial Court recently restated and reaffirmed long-held principles of statutory construction. In Commonwealth v. Clerk-Magistrate of the West Roxbury Div. of the Dist. Court Dep’t., 439 Mass. 352, 355-56 (2003), the SJC said:
It is a standard canon of statutory construction that “the primary source of insight into the intent of the Legislature is the language of the statute.” International Fid. Ins. Co. v. Wilson, 387 Mass. 841, 853 (1983). A court may not add words to a statute that the Legislature did not put there. See General Elec. Co. v. Department of Envtl. Protection, 429 Mass. 798, 803 (1999), and cases cited. “Statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result.” Sullivan v. Brookline, 435 Mass. 353, 360 (2001). See O’Brien v. Massachusetts Bay Transp. Auih., 405 Mass. 439, 443-44 (1989). Where, as here, the language of the statute is clear and unambiguous, it is conclusive as to the intent of the Legislature. See Pyle v. School Comm. of So. Hadley, 423 Mass. 283, 285 (1996).
This Court is persuaded by the logic of the argument that a typical consumer depositor of artwork with a consignee like Haley & Steele should not be required to comply with the complexities of secured lending under Article 9 of the Uniform Commercial Code in order to have protection from Haley & Steele’s general creditors. That being said, however, do the mandates of sec. 2-326 come into play when there is a consumer consignment that is not covered by Article 9? In other words, are these consumer consignments a “sale or return” as defined in sec. 2-326(l)(b), and, if so, do they become subject to the claims of Haley & Steele’s general creditors while in Haley & Steele’s possession?
Certainly prior to the 2001 amendments, sec. 2-326 appears to have reached consignments of the kind here discussed. See subsection (3) of the former sec. 2-326.
However, any comparison of the statutory language before and after the 2001 amendments makes clear that subsection (3) has been significantly rewritten, and any reference to consignments has been wholly removed. This Court considers that something that it cannot ignore and should not presume was unintentional on the part of the Legislature.
In this context, it does not pass unnoticed that Article 2 covers “Sales.” The Article is “limited to those [agreements] relating to the present or future sale of goods.” “A ‘sale’ consists in the passing of title from the seller to the buyer for a price (section 2-401).” Sec. 2-106(1). Sec. 2-401 makes it clear that title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed upon by the parties.
In the typical Haley & Steele “Art Consignment Agreement,” there is specific language to the effect that “title to each of the Artworks remains in the Consignor until the Consignor has been paid,” or there is reference “to the following item of your property” (emphasis added), the latter implying that title will not pass until a certain designated “Minimum Retail Price” is obtained. Under either arrangement, it is clear that title is not expected to pass from the consignor to Haley & Steele, but rather, with the assistance of Haley & Steele, title will pass from the consignor to the ultimate purchaser upon payment of an appropriate retail price to the consignor and a commission to Haley & Steele.
To characterize a consignment as a sale or return, the Court must be able to conclude that there was a “present sale” of the consigned goods. Sec. 2-326 requires a sale. Title must be delivered to a buyer, which is not what happens when goods pass from a consignor to a consignee. See, e.g., Goss v. Morgansen’s Ltd. (In re Morgensen’s Ltd.), 2005 WL 2370856 at *9.
In Comment 4 to the amended sec. 2-326, it is said that “[cjertain true consignment transactions were dealt with in the former Sections 2-326(3) and 9-114. These provisions have been deleted and have been replaced by new provisions of Article 9.” Respected commentators James J. White and Robert S. Summers, in 4 Uniform Commercial Code at 38 (5th ed.), posit that “[i]t is unlikely that the drafters wished to leave the consumer consignor worse off than a commercial consignor, yet that would be the outcome if consumer consignments (now excluded from Article 9) are governed by 2-326.”
In the present absence of any Uniform Commercial Code regulation, consumer consignments are now governed, once again, by the common law.[1] This, then, is essentially the law of bailments. “A bailment, by definition, arises only upon delivery of possession of property sought to be bailed, and at least some degree of control over that property, to the putative bailee.” Sewall v. Fitz-Inn Auto Parks, Inc., 3 Mass.App.Ct. 380, 383 (1975).
The law of bailment is a special branch of jurisprudence under the common law. It is founded upon express or implied contract between the parties. The delivery of a chattel in bailment, apart from specific stipulation, confers on the bailee the right to use and enjoy possession free from control by the bailor, subject to the obligation to do so with care, with due regard to its nature and characteristics and its preservation in safety, and to return it in good order barring unavoidable casualties at the *207 expiration of the bailment. The general title remains with the bailor; the bailee maintains a special interest for the purposes of the bailment.
(Emphasis added.) Nash v. Lang, 268 Mass. 407, 414 (1929). See also King v. Trustees of Boston University, 420 Mass. 52, 59-60 (1995).

CONCLUSION

Based upon the law as discussed and interpreted above, this Court rules that evidentiary findings by the Special. Master, as included in his Fifth Report, that certain consignors are “consumer consignors” are adequate, without more, if grounded upon the fact that the artwork in issue was, immediately before its delivery to Haley & Steele, consumer goods.

 While admittedly dealing here with personal property, as opposed to real property, the Court cannot help but observe certain legal similarities between the two in the common law. When a person sells his or her home, title passes to the ultimate purchaser, not to the broker, who is rewarded for his or her efforts by a commission. Nor does the broker get title to the real property simply because of its listing for sale. Even a change of title to real property by adverse possession requires some sort of open and notorious act of possession without the permission of the owner. Is Haley & Steele, in the case of a consumer consignment, really that much different than a real estate broker? Haley & Steele certainly does not hold the consignor’s artwork without the consignor’s permission or in any open and notorious way contrary to the title of the consignor.