BREWSTER WALLCOVERING COMPANY *vs.* BLUE MOUNTAIN
WALLCOVERINGS, INC.

No. 05-P-1044.

Norfolk. September 20, 2006. - April 6, 2007.

Present: RAPOZA, C.J., LAURENCE, & GRAINGER, JJ.

*Contract,* Performance and breach, Misrepresentation. *Frauds, Statute of. Actionable Tort. Consumer Protection Act,* Businessman's claim, Unfair or deceptive act, Damages. *Uniform Commercial Code,* Sale of goods. *Damages,* Loss of profits, Mitigation, Tort. *Evidence,* Parol evidence.

In a civil action in which the plaintiff, a wallpaper distributor, alleged that the defendant, a wallpaper manufacturer, breached its agreement to supply the plaintiff with certain lines of wallpaper by consistently failing to fill orders in a timely manner, the evidence supported the existence of an enforceable oral agreement between the parties regarding the defendant's reliably supplying the plaintiff with the wallpaper in question [594-598]; further, the Statute of Frauds did not bar enforcement of the agreement, where the defendant admitted in court that an agreement for the sale of goods was made, where subsequent documents between the parties sufficiently recognized the existence of the oral agreement, and where there had been continuous part performance of the oral agreement [598-600].

In a civil action in which the plaintiff, a wallpaper distributor, alleged that the defendant, a wallpaper manufacturer, breached its agreement to supply the plaintiff with certain lines of wallpaper by consistently failing to fill orders in a timely manner, the record contained sufficient evidence to allow the jury to find that the defendant had induced the plaintiff to enter the agreement by intentionally misrepresenting that the defendant had enough production capacity to insure the reliable supply that was so important to the plaintiff [600-604]; moreover, the finding of intentional misrepresentation was a sufficient foundation for the jury's finding of a violation of G. L. c. 93A in a business context [604-608].

Evidence at the trial of a contract action failed to establish the elements necessary to support the plaintiff's claim that the defendant had tortiously interfered with the plaintiff's advantageous relationships with its customers. [608-609]

Although the defendant in a breach of contract action failed to demonstrate that the prevailing plaintiff's expert witness improperly calculated lost profit damages based on the plaintiff's gross profits [609-611], remand to the trial court on the issue of damages was required where the defendant effectively bore its burden of demonstrating that the plaintiff did not make

reasonable efforts to mitigate the damages stemming from the breach [611-614], and where the plaintiff failed to demonstrate the foreseeability and causation of certain damages [614-616]; further, the plaintiff could not recover any lost profit damages arising from its unjustifiable anticipatory repudiation of a separate contract with the defendant [616-619].

CIVIL ACTION commenced in the Superior Court Department on December 22, 1999.

The case was tried before *Elizabeth B. Donovan, J.*

*Mark C. Fleming (Michael R. Heyison, Pratik A. Shah, & Francis J. DiMento* with him) for the defendant.

*William C. Nystrom (Colleen C. Cook & Joel G. Beckman* with him) for the plaintiff.

LAURENCE, J. This appeal arises out of a wallpaper distributor's complaint that a wallpaper manufacturer breached its agreement to supply the distributor with certain lines of wallpaper by consistently failing to fill orders in a timely manner, and additionally committed intentional misrepresentation and a G. L. c. 93A violation with respect to the agreement. The complaint of the plaintiff distributor, Brewster Wallcoverings Company (Brewster), a Massachusetts entity, against the defendant manufacturer, Blue Mountain Wallcoverings, Inc. (Blue Mountain), a Canadian company, also alleged breach of the implied covenant of good faith and fair dealing, promissory estoppel, fraudulent inducement, and interference with advantageous customer relations.

After an eight-day trial beginning on September 15, 2003, the case was submitted to the jury on special questions, in answer to which the jury found Blue Mountain liable on all counts, including a finding that the c. 93A violation had been committed "wilfully or knowingly," and awarded Brewster a lump sum of $2,348,288 in compensatory damages.[1] After a posttrial hearing, the trial judge awarded Brewster double damages on the

---

[1]At trial, Brewster had claimed its damages to have been $3.3 million. The jury awarded a lump sum of $2,348,288 in compensatory damages, without explanation as to why they did not grant Brewster's entire request. The damage figure, unattributed to any of the several different theories of recovery, presumably reflected the judge's instruction that "the plaintiff is only entitled to recover once, not for various infractions of the different counts. . . . They're not entitled to multiple damages."

basis of the "wilful or knowing" finding and $624,614.53 in attorney's fees under c. 93A, stating, "I adopt the decision of the jury on the 93A claim and find it is well supported by the evidence."[2]

The principal question before us is whether Brewster presented sufficient evidence at trial to warrant the jury's verdicts. We reverse the verdict on the count for tortious interference with advantageous customer relations as unsupported by the evidence and we vacate the damages verdict (including the judge's order awarding double damages on the c. 93A count) because Brewster failed to present evidence of any efforts to mitigate its damages and also presented insufficient evidence to support two constituent elements of its claim for damages.

I. *Factual background. A. Breach of contract.* We recite the most pertinent facts that the jury could have found based on the evidence viewed in the light most favorable to Brewster (with certain other material facts reserved for discussion of specific issues). Brewster is a wallpaper distributor that has operated as a family-run business since the 1890's, with a principal office in Randolph.[3] Its geographic area of distribution encompasses the United States, with office and warehousing facilities in Massachusetts, Kentucky, and California. As is typical of a distributor in the wallpaper industry, Brewster purchased sample books of wallpaper patterns from manufacturers and placed those books in retail stores.[4] For more than twenty years, Brewster had a relationship with GenCorp, Inc. (GenCorp), the

---

[2]On October 8, 2003, the court entered judgment in Brewster's favor in the amount of $5,321,190.53.

[3]During the relevant time period, Brewster was a subsidiary of a Massachusetts business trust, Brewster Wallpaper Trust, and a subchapter S corporation for income tax purposes. The production of wallcoverings, including wallpaper and fabric-backed products, and their sale to residential consumers involves three entities: manufacturers, distributors, and retailers. Manufacturers print wallcoverings to fill purchase orders from distributors. Distributors, in turn, provide wallcoverings to retailers, which may be large chain stores or local merchants, who sell the products to consumers. If a consumer desires a particular pattern of wallcoverings that the retailer does not have in stock, the retailer orders it from the distributor, who may submit a purchase order to the manufacturer if the order exceeds the distributor's own inventory.

[4]Manufacturers commit to supply the wallpaper collections until the sample book's expiration date, which is typically three years from the date of its introduction. See note 7, *infra*.

manufacturer of the "GenCorp" lines of wallcoverings, which included one of Brewster's best-selling wallpaper brands, "Sanitas," among others.[5] One of several GenCorp distributors, Brewster held the exclusive right to distribute the GenCorp lines in the mid-Atlantic region of the country, a particularly lucrative area.

On December 11, 1998, Blue Mountain acquired from GenCorp certain assets, including the rights and equipment to print the GenCorp lines, consisting of five brands of wallpaper: Sanitas, Essex, Fashon, Chapters, and Designs for Living. The asset purchase agreement required Blue Mountain to transfer GenCorp's wallpaper inventory and printing presses from GenCorp's plant in Mississippi to Blue Mountain's warehouse in Toronto, Canada. On December 3, 1998, Blue Mountain's president, Christopher Wood, met Brewster's president, Kenneth Grandberg, for dinner to discuss the impending GenCorp transaction. Wood assured Grandberg that there would be a "seamless transition" of the manufacturing and distribution of the GenCorp lines from GenCorp to Blue Mountain.

On December 18, 1998, Wood, accompanied by Blue Mountain's vice-president of sales and marketing, John Hooker, met with Grandberg and other Brewster representatives at Brewster's headquarters in Randolph (sometimes referred to as December 18 meeting).[6] At that meeting, Wood orally agreed to continue to do "business as usual" with respect to GenCorp products, and to accept Brewster's purchase orders and service the GenCorp lines in a timely manner through their discontinuation dates.[7] In return, Brewster promised to continue to promote and distribute the GenCorp lines to its retail customers by carrying adequate inventory of such lines as it had done historically, keeping GenCorp sample books on the shelves, and filling orders for GenCorp products.

---

[5]Wallcoverings are marketed under various brands, or "lines," each of which consists of several "collections" of wallpaper patterns.

[6]At the time, Brewster had over ninety million dollars in annual sales, approximately three times Blue Mountain's sales.

[7]The discontinuation or expiration date refers to the shelf life of a wallpaper product. A typical wallcovering collection has a life span of three years, after which its sample book is typically discontinued. Manufacturers may extend the life span of a successful collection.

According to Brewster witnesses, Wood made several other promises to Brewster at the December 18 meeting. First, he stated that there would be no service interruption to Brewster caused by the transfer of the physical assets of the business from GenCorp's headquarters in Mississippi to Blue Mountain's plant in Toronto. Second, he told of his plan to keep two Gen-Corp printing presses running in Mississippi while the remaining presses were disassembled and shipped to Toronto.[8] In addition, Wood promised that the machinery would be transferred and production would begin in Toronto by March 1, 1999.[9] He further expressed his intention to move GenCorp's existing inventory from Mississippi to Toronto and to use that inventory to fill purchase orders until Blue Mountain was capable of printing new product in Canada.

Although the oral agreement made at the December 18, 1998, meeting (sometimes referred to as December 18 agreement) was never manifested in a written contract, it was subsequently reflected in multiple writings between the parties. Within three business days of that agreement, Brewster began placing orders for GenCorp products by sending Blue Mountain written purchase orders. On December 23, 1998, Brewster faxed Blue Mountain a signed memorandum setting forth the procedures for filling its orders, which required Blue Mountain to confirm acceptance of an order by faxing back a corresponding reference number, and invited Blue Mountain to call if it had any questions regarding Brewster's terms. Blue Mountain confirmed acceptance of those purchase orders without question or qualification — as it did with respect to every subsequent Brewster order until the relationship soured in December, 1999 — in the manner specified by Brewster, i.e., by assigning a reference

[8]In January, 1999, Wood saw Grandberg at a meeting and told him that he no longer intended to keep two machines running in Mississippi as they would not be necessary for production. Grandberg did not object to the change in plans.

[9]Blue Mountain disputed this fact, as to which the Brewster witnesses testified unequivocally. Blue Mountain argues on appeal that Wood's testimony (at a deposition read at trial), properly interpreted, meant only that he planned having some of the disassembled presses ready for production in Toronto by March 1, 1999, but anticipated the transfer of all the equipment and machinery (including the two presses to be left at GenCorp's warehouse during the transition) to be completed by June 1, 1999.

number to each purchase order and faxing the reference number back to Brewster.

Brewster also regularly requested production dates from Blue Mountain, which Brewster deemed were "critical" so as to allow it to advise customers of expected delivery dates on orders and on back ordered items. Not until April, 1999, however, did Blue Mountain begin providing written production dates to Brewster, virtually none of which proved reliable. Finally, written correspondence between the parties regarding the GenCorp lines confirmed the business relationship. In particular, in October, 1999, Brewster and Blue Mountain exchanged letters confirming an extension of the expiration dates on certain wallpaper lines.

At trial, it was undisputed that Blue Mountain provided exceptionally poor and usually untimely service to all of its distributor customers[10] on the GenCorp lines from December, 1998, through December, 1999. Brewster offered testimony that, prior to Blue Mountain's acquisition of the GenCorp lines, Brewster was able to fill customers orders the same day over ninety percent of the time.[11] Because of Blue Mountain's almost consistently tardy service, Brewster reached a zero-percent "fill-rate" with one of its major national customers, Home Depot (i.e., Brewster was unable to fill a single GenCorp order because items were out of stock and placed on back order). By May, 1999, Brewster's back orders on GenCorp products had reached "crisis" proportions, accumulating to an unprecedented high of 157,000 rolls.[12] Brewster personnel testified that its customer service line was inundated by calls from angry retail-

---

[10]Blue Mountain had several distributors of the GenCorp lines in different regions of the country. As noted, Brewster had the right to distribute the lines in the mid-Atlantic region as well as to certain large national chain stores, including Home Depot.

[11]The importance of prompt customer service in the wallpaper industry was also undisputed at trial. Blue Mountain acknowledged that no customer would wait several months for wallpaper, and that customers would generally want wallpaper the same day they order it, or close thereto.

[12]Grandberg testified that at the time Brewster's first order was placed with Blue Mountain, on December 23, 1998, there were only about 10,000 rolls on back order. Blue Mountain's representatives testified that it had encountered many difficulties, both anticipated and unforseen, while initiating its newly acquired GenCorp business. Testimony was offered that equipment was dam-

ers, many of whom said they were cancelling or threatened to cancel their orders.[13]

At a meeting between the parties on May 18, 1999, Wood assured Brewster that Blue Mountain had resolved its problems and agreed to send a public relations letter to Brewster's customers, accepting responsibility for poor service on the GenCorp lines and assuring them that its "problems . . . are now behind us." Blue Mountain also committed to filling eighty percent of Brewster's back orders in five weeks and promised to provide Brewster with accurate production dates.[14] Nonetheless, six weeks after the May, 1999, meeting, Blue Mountain still owed Brewster 125,000 rolls of wallpaper on back order.[15] Over the course of the next several months, Blue Mountain attempted to fill outstanding back orders and maintain improved production levels. Somewhat mollified by these concerted efforts, Brewster sent a letter to Blue Mountain on August 19, 1999,[16] agreeing to forge ahead in early 2000 on the "Diane Richmond" line, a

aged in transport to Canada, that the quality of certain wallpaper materials turned out to be subpar, that there were discrepancies regarding the amount of GenCorp inventory Blue Mountain had thought it was purchasing, and that GenCorp's unionized employees, angered over their own loss of jobs and Blue Mountain's use of nonunion workers, sabotaged Blue Mountain's smooth transition of the GenCorp lines. As a result, Blue Mountain provided bad service to all of its twenty or more distributors (not merely to Brewster) on the GenCorp lines during the less than "seamless transition" it had expected. Blue Mountain did not manage to get "caught up" in alleviating its back order problem until the end of December, 1999.

[13]Brewster failed, however, to document the facts of and attending any such cancellations, including customers' reasons for their supposed cancellations, whether its sales representatives had offered such customers substitute items, and whether customers ever selected a substitute wallpaper, which Brewster's expert witness conceded on cross-examination probably occurred one-half of the time.

[14]When an item was placed on back order, Brewster requested that Blue Mountain provide an accurate production date (a date it anticipated shipping the item to Brewster), so that Brewster could inform its customer of the product's expected arrival date. Brewster offered testimony that accurate production dates were crucial for maintaining good relationships with customers, but that Blue Mountain almost invariably provided dates it failed to meet.

[15]Approximately eight rolls of wallpaper are needed to complete an average single room.

[16]A Brewster executive acknowledged at trial that the August 19, 1999, letter was an agreement.

new collection of wallpapers to be manufactured by Blue Mountain and distributed exclusively by Brewster.[17]

Despite Blue Mountain's efforts to improve production, Brewster ultimately became totally dissatisfied with service on the GenCorp lines. Grandberg testified that he had lost confidence in Blue Mountain as a manufacturer beginning at the end of October or early November. By December, 1999, Brewster had filed the underlying action against Blue Mountain[18] and had also terminated the August, 1999, agreement to launch the Diane Richmond line in February, 2000, because Blue Mountain had proven itself an unreliable business partner.[19] Brewster officers testified that well into the fall of 1999, Blue Mountain was still failing to provide accurate production dates for items on back order, as well as regularly and without valid explanation neglecting for unreasonable lengths of time to respond to Brewster's telephone calls and letters voicing its concerns.[20]

B. *Intentional misrepresentations.* Brewster's reiterated

---

[17]The details of this agreement are contained in the August 19, 1999, letter, which provided that Brewster intended to introduce the Diane Richmond line in February, 2000, and that Blue Mountain was expected "to service *this line* in a timely manner" (emphasis added). The letter went on to state, "[i]f we find that the service levels are not adequately maintained, Brewster will remove the cylinders and reimburse Blue Mountain $285.00 (U.S.) per cylinder plus freight and cost of packing & handling," i.e., terminate the Diane Richmond relationship (the words "plus freight and cost of packing & handling" were handwritten).

[18]At the time Brewster filed suit, it had only 10,612 rolls of GenCorp wallpaper on back order. Brewster presented testimony that most of the GenCorp product had been discontinued at that point, so that there were fewer orders being placed.

[19]Undisputed Blue Mountain testimony established that Blue Mountain was ready to go into full production of the Diane Richmond line by November, 1999. Brewster failed to reimburse Blue Mountain the $285 per cylinder (plus the cost of packing and shipping) upon cancellation of the contract, as specified in the August 19, 1999, agreement. Instead, Brewster offered to give the money to its lawyer to hold until the cylinders were returned. Blue Mountain refused this arrangement. Brewster then purchased new cylinders to print the wallpaper itself and delayed the introduction of the Diane Richmond line for sixteen months, until June, 2001. Brewster's expert conceded that there existed other manufacturers that could have produced the Diane Richmond line well before Brewster's own manufacturing subsidiary, International Wallcoverings, Inc., geared up to do so.

[20]Several letters were admitted in evidence in which Brewster beseeched

contention at trial was that Blue Mountain had knowingly made false representations to Brewster on December 18, 1998, in order to deceive Brewster into entering the contract and promoting the GenCorp lines to its customers.[21] A portion of Wood's deposition was read to the jury, in which (Brewster argued) he had acknowledged that he knew as early as December, 1998, that it would take six months, until June 1, 1999, for Blue Mountain to begin full production in Canada on the GenCorp lines — even though he promised Brewster a March, 1999, production date at the December 18 meeting. In pertinent part, Wood was asked at his deposition:

> *Q.* "When did Blue Mountain anticipate that it would be up and running in Canada, producing product on the presses purchased from GenCorp?"
>
> *A.* "Approximately June, '99."
>
> *Q.* "So as of December of 1998, was it Blue Mountain's estimate that it would be producing product on the GenCorp machinery in Canada, and filling orders by June 1?"
>
> *A.* "For production, yes. June 1, yes. That was what was anticipated."

In addition, Brewster presented testimony that at the December 18 meeting Blue Mountain promised to fill Brewster's orders during the transition period from its existing wallpaper

Blue Mountain to provide it with accurate production dates for items on back order. Albert Miller, Blue Mountain's former operations manager, testified at his deposition that Blue Mountain attempted to provide Brewster with production dates, but that they were often inaccurate and known to be so when provided. Grandberg also testified that there were occasions between September and December, 1999, when it appeared that Blue Mountain had "turned the corner" by sending a shipment of goods previously on back order, but that those moments of hope always proved fleeting. By November, 1999, Brewster still had customers that had been waiting eleven months for orders to be filled (another disappointing first for Brewster).

[21]According to Grandberg's testimony, Blue Mountain had no other immediately feasible way to attain orders for GenCorp product in the profitable mid-Atlantic region because Brewster had been GenCorp's sole distributor in that area for many years.

inventory.[22] Wood also stated at that meeting that Blue Mountain's warehouse in Canada was ready to accept GenCorp's inventory from Mississippi and that Blue Mountain would transfer all inventory to its Toronto warehouse by March 1, 1999. GenCorp's warehouse manager, Michael Kelly, testified, however, at a deposition read at trial, that the inventory was in fact not completely transferred from Mississippi until June, 1999, because Blue Mountain "probably" did not have an available warehouse. Kelly further stated that GenCorp repeatedly had to "beg" Blue Mountain (which hired only three men to perform all the work) to remove its large inventory from Gen-Corp's Mississippi warehouse.[23]

To bolster its claims for intentional misrepresentation and violation of c. 93A, Brewster also presented evidence of Blue Mountain's asserted malicious intention to harm Brewster's business.[24] In December, 1998, Blue Mountain was negotiating a merger with another Canadian manufacturer, International Wallcoverings, Inc. (International).[25] Wood admitted that one proposed condition of the merger was that International would terminate its existing relationship with Brewster as International's distributor of the International product lines — a fact he did

[22]Blue Mountain had acquired (so it thought) nearly two million rolls of inventory from GenCorp and promised Brewster access to this stock during the transition to fill customer orders. In reliance on this promise, Brewster began placing orders for GenCorp wallpaper as early as December 23, 1998. Blue Mountain had not performed due diligence confirmation of GenCorp inventory, however, and later discovered what it believed to be a large discrepancy between what it thought it was acquiring and what actually existed.

[23]Blue Mountain countered that it did have a warehouse ready, that Gen-Corp's employees impeded its ability to transfer the inventory and machinery, and that at most Blue Mountain negligently (not intentionally) failed to perform a due diligence survey of the inventory prior to the December 18 meeting with Brewster.

[24]This was in addition to Brewster's evidence that Blue Mountain persistently failed to return numerous telephone calls or respond to electronic mail messages and letters, gave production dates six weeks after they were requested (as opposed to other manufacturers, who usually responded to Brewster's requests within forty-eight hours), and knew that the production dates it provided were unreliable when given.

[25]The merger eventually fell through, and Brewster itself acquired International in August, 1999. International went on to manufacture the Diane Richmond line for Brewster in June, 2001.

not mention to Brewster in December, 1998.[26] Brewster also presented evidence that Blue Mountain had no intention of renewing its distributorship agreement with Brewster once the GenCorp lines reached their discontinuation dates, and had designated other distributors to take over their distribution in the mid-Atlantic region.

C. *Damages.* John Kampner, Brewster's vice-president of operations for twenty-one years, had worked in the wallpaper industry for thirty-nine years. He testified as an expert regarding Brewster's damages attributable to its problems with Blue Mountain (although he disavowed any accounting expertise).[27] In calculating damages, Kampner argued that Blue Mountain's conduct had harmed Brewster's sales on both the GenCorp and the Diane Richmond lines and had caused collateral damage to other Brewster wallpaper lines. The primary basis for his conclusions was that Brewster's sales of the GenCorp lines dropped from $4.7 million in 1997 and 1998 to $2.6 million in 1999, despite the fact that Brewster had acquired a lucrative new territory and several new major chain accounts. Additionally, customer cancellations of orders of GenCorp products rose from two percent in each of the prior years to twenty-five percent of total sales in 1999.[28]

Kampner further claimed that Brewster's nonGenCorp lines were "tainted" by Blue Mountain's poor GenCorp service, a phenomenon supposedly evidenced by the fact that 1999 sales substantially fell in stores that sold both GenCorp and nonGenCorp wallcoverings while increasing in stores that did not handle GenCorp products. Brewster's customer service representatives testified that anonymous angry consumers berated unidentified retailers over the delays in filling GenCorp orders, leading some

---

[26]Wood maintained at trial that the negotiations with International were confidential, that he therefore could not disclose the condition to Brewster, and that the matter was in any event irrelevant to Brewster's becoming Blue Mountain's distributor for GenCorp lines.

[27]Brewster's claimed damages fell into three general categories: (1) lost profits on the GenCorp lines in 1999 and 2000; (2) lost profits on nonGenCorp lines in 1999; and (3) lost profits on the Diane Richmond line.

[28]As noted above, note 13, *supra*, Brewster failed to document any of the customers' reasons for cancelling orders and whether such customers ordered substitute wallcoverings in place of GenCorp products.

of those unnamed retailers, in consequence, to take, or threaten to take, Brewster's sample books off their shelves.[29] Kampner estimated that Brewster's lost profits as a result of Blue Mountain's defective service on the GenCorp lines totaled $3.3 million.[30]

After Brewster rested, Blue Mountain moved for a directed verdict on the basis, among others, of the insufficiency of Brewster's damages evidence, particularly Kampner's failure to distinguish Brewster's gross profits from its net profits in his damages calculation. (Indeed, as Blue Mountain argued, Kampner never mentioned the term "net profits" during his testimony, nor had he discussed the impact of overhead costs, such as warehouse expenses, or variable expenses, such as the cost of shipping). The judge denied Blue Mountain's motion, and on Brewster's motion, allowed Kampner to return to the stand (without objection from or cross-examination by Blue Mountain) to "clarify" his position that Brewster's overhead costs were fixed and that Brewster's gross profits indeed equaled its net profits.[31]

[29]Brewster failed, however, to present a single retail dealer who could testify that it ceased to display Brewster's sample books because of GenCorp delay and introduced no documents reflecting such an event.

[30]To arrive at $3.3 million in damages, Kampner first calculated the lost sales on the GenCorp lines for 1999 and 2000 by projecting what the sales should have been if Blue Mountain had properly performed. In 1999, Brewster lost $2.1 million in sales on the GenCorp lines and another $1.5 million in 2000. Kampner then used the average profit margin for each of the GenCorp lines over three years (1997-1999) to determine lost profits of nearly $1.5 million on the lost GenCorp sales. In addition to lost profits on the GenCorp lines, Kampner calculated that Brewster lost $2.8 million in sales on nonGenCorp products in stores that sold both GenCorp and nonGenCorp products. The lost profits due to the "taint" on the nonGenCorp products totaled $1.5 million. Finally, he claimed that Brewster lost profits of over $372,000 on lost sales of almost $631,000 on the Diane Richmond line because of the sixteen-month delay in the line's introduction to the market.

[31]The purported equivalence of gross and net profits was stressed to the judge by Brewster's lawyers in arguing that Kampner should be allowed to be recalled to clarify his testimony. In pertinent part, Kampner's "clarifying" testimony (which Blue Mountain's counsel did not probe on cross-examination) was as follows:

*Q.* "What is a net profit?"

*A.* "The net profit typically is — from the gross profit you deduct

At the conclusion of the trial (after Blue Mountain's second directed verdict motion was denied), the case was submitted to the jury on special questions (to which Blue Mountain did not object). The jury found that (1) there was a contract for the sale of goods between the parties; (2) Blue Mountain breached that contract; (3) Blue Mountain also breached its covenant of good faith and fair dealing; (4) Blue Mountain made "false statement(s)" concerning a material "fact, knowing the fact to be false or with reckless disregard for the truth or falsity, with the intent that Brewster would reasonably rely on the fact in placing its orders"; (5) Brewster sustained "damages as a result of the intentional misrepresentation(s)"; (6) Blue Mountain knowingly interfered with Brewster's customer relations, to Brewster's detriment; (7) Blue Mountain "wilfully or knowing[ly]" committed an unfair and deceptive business act or practice, which was a substantial factor in the damages Brewster sustained, and which substantially occurred in Massachusetts[32]; and (8) $2,348,288 was the sum to be awarded to adequately compensate Brewster "as a result of the legal wrong done by Blue Mountain."[33]

II. *Discussion.* Blue Mountain's argument on appeal is essentially an attack on the sufficiency of Brewster's evidence regarding the existence of an enforceable contract, the alleged torts, and the G. L. c. 93A violation, as well as the amount of Brewster's damages.[34] Blue Mountain bears a particularly heavy burden on its appeal. An appellate court will not set aside a jury

---

any overhead expenses or intended expenses of that [*sic*]. After you have paid these additional expenses, you end up with a net profit."

*Q.* "Could you explain what overhead expenses are, please?"

*A.* "Overhead would be typically warehouse rent, heat, light, and power, fixed expenses of that sort."

[32]This response was to a set of related questions that we have combined into one answer.

[33]In addition, the jury found that the doctrine of promissory estoppel applied. We need not address this issue because it is of no legal consequence, an enforceable contract having been found to have existed between the parties, a finding we conclude was supported on the record. See *Loranger Constr. Corp.* v. *E.F. Hauserman Co.,* 376 Mass. 757, 763 (1978).

[34]We reject Brewster's argument that Blue Mountain waived its right to

verdict on any material fact found by a jury unless the jury verdict or fact has no rational basis in the evidence. A jury verdict will be upheld so long as "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Tufankjian* v. *Rockland Trust Co.*, 57 Mass. App. Ct. 173, 178 n.9 (2003), quoting from *Dobos* v. *Driscoll*, 404 Mass. 634, 656, cert. denied, 493 U.S. 850 (1989). "If any such combination of circumstances could be found it is . . . immaterial how many other combinations could have been found which would have led to conclusions adverse to the plaintiff." *Kelly* v. *Railway Express Agency, Inc.*, 315 Mass. 301, 302 (1943).

A. *Breach of contract.* With respect to the contract issue, the requisite proplaintiff combination of circumstances can be rationally found in the evidence, which supports the existence of an enforceable agreement between Brewster and Blue

challenge the sufficiency of the evidence by failing to make a postverdict motion (for judgment notwithstanding the verdict or for a new trial) before bringing this appeal. Blue Mountain's motions for directed verdict at the close of Brewster's case and after both parties rested, on the ground, among others, of the insufficiency of evidence as to the proof of damages as well as the substantive allegations, were sufficient to preserve its appellate arguments. See *Tucker* v. *Badoian*, 376 Mass. 907, 916 (1978). The cases Brewster relies on, *Shafir* v. *Steele*, 431 Mass. 365, 371 (2000), and *Connors* v. *New England Tel. & Tel. Co.*, 22 Mass. App. Ct. 243, 244 (1986), do not hold to the contrary, their discussions dealing with what was sufficient to preserve an appeal in those cases, not what is mandatory. The Federal authority cited by Brewster, particularly *Unitherm Food Sys., Inc.* v. *Swift-Eckrich, Inc.*, 126 S. Ct. 980, 988 (2006), to the effect that the making of a postverdict motion is necessary to give the appellate court jurisdiction to entertain an appeal, is not the law of Massachusetts (the *Unitherm* court having relied on several older United States Supreme Court cases that *Tucker* v. *Badoian, supra*, significantly did not follow). If the strict Federal rule were to be newly adopted in Massachusetts, neither this court nor this case would be the appropriate vehicle, especially since the trial judge's posttrial observation — that the jury's verdict on the c. 93A claim (necessarily including the damage award, which was not separately allocated to any specific claim) was "well supported by the evidence" — makes it plain that it would have been futile for Blue Mountain to have moved for postverdict relief on the thrice-reiterated basis of insufficiency of the evidence. We are mindful of "the mandate that the [Massachusetts] rules of civil procedure are instruments for the promotion of justice . . . not the exaltation of mere technicalities." *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 484 n.8 (2000).

Mountain regarding the latter's reliably supplying Brewster with GenCorp products. Except where the evidence is undisputed or consists solely of writings, whether a contract was intended to be formed, what were its terms, and whether it was supported by consideration are issues of fact for determination by the jury. See *Bresky* v. *Rosenberg*, 256 Mass. 66, 72, 74-75 (1926); *Gleason* v. *Mann*, 312 Mass. 420, 423 (1942); *King* v. *Trustees of Boston Univ.*, 420 Mass. 52, 63-64 (1995).[35]

Blue Mountain argues that the parties did not form a binding contract on December 18, 1998, for a number of reasons[36] we deem preempted by the verdict on this record. Brewster offered sufficient evidence for the jury rationally to find that it had reached an enforceable oral agreement with Blue Mountain for reliable supply of GenCorp products at the December 18 meeting. Grandberg testified that Wood unqualifiedly promised to provide Brewster timely and "seamless" service on the GenCorp lines through their discontinuation dates. Wood admitted as much at trial, conceding that the parties had an agreement as of December 18, 1998. In exchange, Brewster promised to promote the GenCorp lines in the marketplace by keeping sample books of GenCorp wallpaper displayed on its customers'

---

[35]A binding agreement is established when (1) the parties manifested the intent, viewed objectively, to be bound at the time of contract formation, notwithstanding either party's subjective intent; (2) the parties agreed on the material terms of the contract; and (3) the agreement was supported by mutual consideration. See, e.g., *Gill* v. *Richmond Co-op. Assn., Inc.*, 309 Mass. 73, 79-80 (1941); *Polaroid Corp.* v. *Rollins Envtl. Servs.*, 416 Mass. 684, 696-697 (1993); *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 878 (2000). The contract at issue was one for the sale of goods, which is governed by art. 2 of the Uniform Commercial Code (U.C.C.). See G. L. c. 106, § 2-106(1). Where the parties to a contract governed by the U.C.C. do not explicitly disclaim or modify them, "default terms" of the U.C.C. apply. G. L. c. 106, § 1-102(3). In addition, the ordinary principles of contract law, such as the requirements of "meeting of the minds" and "mutual consideration" for contract formation, apply wherever the U.C.C. has not specifically displaced them. See G. L. c. 106, § 1-103; *National Shawmut Bank of Boston* v. *Vera*, 352 Mass. 11, 16 (1967).

[36]Blue Mountain asserts that (1) it did not have the requisite intent to be bound to Brewster because there are no guarantees of timely service in the wallpaper industry and Wood merely stated his aspiration, rather than his promise, for a seamless transition of the GenCorp lines; (2) the parties did not agree on a material term of the contract, namely the quantity of goods Blue Mountain was to provide to Brewster; and (3) any contract reached between the parties was illusory because Brewster was not bound to purchase a single item from Blue Mountain.

shelves. The contract was thus not illusory, because the jury could find that the parties mutually intended to be bound and had provided sufficient consideration to support their agreement.[37]

Blue Mountain's argument that the contract was unenforceable because it lacked a quantity term is also unpersuasive. Although contracts generally must specify all material terms, including quantity, in a sale of goods contract, as is here involved, "[a] term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith," and no amount need be specified. G. L. c. 106, § 2-306(1). The jury heard testimony that Brewster had long been the sole distributor of the GenCorp lines in the mid-Atlantic region of the United States, with a historical record of substantial sales of GenCorp products. The jury could, therefore, reasonably find that Blue Mountain had entered a contract to supply Brewster with substantial quantities of GenCorp products representing all of its good faith GenCorp needs in that area, pursuant to G. L. c. 106, § 2-306(1).[38] The lack of discussion or explicit agreement regarding a quantity term at the December 18, 1998, meeting was not so indefinite as to render the contract unenforceable.[39] See G. L. c. 106, § 2-306 comment 2. See also footnotes 37 and 38, *supra*.

---

[37]Although Brewster was not expressly bound to place orders with Blue Mountain, the entirety of evidence and the circumstances attending the December 18 agreement (see *Morse* v. *Chase*, 305 Mass. 504, 509 [1940]; *Gleason* v. *Mann, supra* at 423; Restatement [Second] of Contracts § 202[1] [1981]) — including the facts that Brewster had purchased and distributed GenCorp products for many years prior to December 18, 1998, that GenCorp's principal brand (Sanitas, a fabric-based rather than a paper-based wallpaper) was relatively unique and in demand in Brewster's sales territory, that the agreement was essentially "to continue business as usual" (the volumes and regularity of which prior business Brewster had done with Gen-Corp, being ascertainable by Blue Mountain), and that Brewster's expressed interest in continuity and reliability of service was reciprocated by Wood's several assurances thereof — can be deemed to have informed the parties' intent and expectations that Brewster would be doing so both regularly and in quantity consistent with its past performance.

[38]Brewster offered testimony that the agreement provided for Blue Mountain to supply Brewster with goods to stock Brewster's own inventory of GenCorp products, as well as to fill customer orders, thereby reducing Brewster's risk of incurring large numbers of unfilled back orders.

[39]Although Brewster, without explanation, asserts in its brief that the

Blue Mountain's additional arguments attacking the jury's contract finding are similarly insubstantial. Although he acknowledged that he had "absolutely" agreed on December 18, 1998, to provide Brewster with GenCorp products "as usual" through their discontinuation dates, Wood nonetheless insisted that his assurances to Brewster had amounted to mere commercial puffery, reflecting only his aspirations for a smooth and successful transition of the GenCorp business. Further, even if a contract existed, Wood asserted that Blue Mountain could not be found to have committed a breach, because industry custom dictated that production dates were mere estimates and never guarantees, so that even Blue Mountain's grossly delayed servicing of Brewster's orders did not amount to contract breach.

The jury were free, however, to reject Blue Mountain's evidence on those issues and to credit Brewster's presentation to the contrary; namely, that as of December 18, 1998, the parties had intended to make a binding agreement for Blue Mountain's timely service of the GenCorp lines, an agreement that Blue Mountain almost immediately and consistently thereafter breached. Brewster also offered undisputed evidence of the importance of timely service in the wallpaper industry, in that consumers generally demanded wallpaper the same day they placed their orders and would never wait many months for their orders to be filled; yet Blue Mountain had, in December, 1998, contracted to provide timely service to satisfy Brewster's GenCorp needs knowing that it would take at least six months for full production of the GenCorp lines to begin, resulting in Brewster's having to accumulate vast quantities of unfilled back orders by mid-1999 and to receive poor and untimely service from Blue Mountain (which Blue Mountain did not deny) throughout 1999.

B. *Statute of Frauds.* Blue Mountain argues that, even if there were sufficient evidence for the jury to find that a contract was formed on December 18, 1998, enforcement of that agreement is barred under the Statute of Frauds because it was an oral contract[40] for the sale of goods over $500 (see G. L. c. 106,

December 18 agreement was not a requirements contract, we conclude that it was such a contract, pursuant to G. L. c. 106, § 2-306(1).

[40]Oral contracts are as enforceable as written contracts so long as they are

§ 2-201), and that the trial judge erred in refusing to instruct the jury (as Blue Mountain requested) on the statute.[41]

We agree with Brewster that Blue Mountain's Statute of Frauds defense is unavailing, for several reasons. First, an exemption from the statute exists when, as here, the party to be charged (Blue Mountain, through Wood's own testimony) has admitted in court that a contract for the sale of goods was made. See G. L. c. 106, § 2-201(3)(*b*); *Providence Granite Co. v. Joseph Rugo, Inc.*, 362 Mass. 888, 889 (1972). Second, Brewster's December 23, 1998, order[42] referenced some of the terms agreed upon at the December 18 meeting (such as confirming Brewster's orders by facsimile using assigned reference numbers for purchase orders), and the parties exchanged written correspondence confirming the extension of the discontinuance dates on certain successful GenCorp lines, which extensions were published to Brewster's customers in a semiannual bulletin. These documents sufficiently recognized the existence of the oral agreement. See G. L. c. 106, § 2-201 comment 1

---

not barred by the Statute of Frauds. See *Kilham* v. *O'Connell*, 315 Mass. 721, 724-725 (1944).

[41]Brewster contends that Blue Mountain waived the right to challenge the contract on the basis of the Statute of Frauds. Blue Mountain's counsel did, however, raise the issue at the close of Brewster's evidence and did object to the trial judge's failure to instruct the jury on the Statute of Frauds (although the Statute of Frauds argument was not explicitly included in either of Blue Mountain's written motions for a directed verdict). The specific grounds of a motion for directed verdict are sufficiently brought to the attention of the trial judge if they were stated in written documents or mentioned at any point during the course of the trial, even if not raised at the time the motion is made. See *Rhode Island Hosp. Trust Natl. Bank* v. *Varadian*, 419 Mass. 841, 847 (1995); *Russo* v. *Star Mkt. Co.*, 6 Mass. App. Ct. 875 (1978). Blue Mountain's counsel gave the judge an opportunity prior to the jury's deliberations to rule on the Statute of Frauds when he unsuccessfully objected to the judge's failure to instruct the jury on this issue. Blue Mountain thus adequately preserved the issue for appeal.

[42]Although the document was not signed by a Blue Mountain representative, "the party against whom enforcement is sought" under G. L. c. 106, § 2-201(1), this memorandum falls within the statute's exception under G. L. c. 106, § 2-201(2), for business dealings between merchants. Under that provision, a writing need not be signed by the party to be charged if both parties to the agreement are merchants and the party to be charged fails to object to the writing. Both parties here were undisputedly merchants (see G. L. c. 106, § 2-104[1] & [3]), and Blue Mountain never objected to or rejected any of the thousands of subsequent orders Brewster placed.

("All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction"). Moreover, multiple writings of the sort here involved can be read together to determine whether the requirements of the statute are satisfied. See *Bresky* v. *Rosenberg*, 256 Mass. at 69-70, 72; *Waltham Truck Equip. Corp.* v. *Massachusetts Equip. Co.*, 7 Mass. App. Ct. 580, 583 (1979). Moreover, the statute does not apply when there has been, as here, part performance — indeed, continuous part performance — of an agreement, manifested by the numerous post-December 18, 1998, purchase orders, reference numbers, order confirmations, requests for production dates, provision of production dates, letters extending certain expiration dates, correspondence regarding performance, delivery (if usually belated) of large quantities of Gen-Corp products pursuant to the purchase orders, and substantial payments made therefor. See G. L. c. 106, § 2-201(3)(*c*). Cf. *Winstanley* v. *Chapman*, 325 Mass. 130, 133 (1949); *Boyle* v. *Douglas Dynamics LLC*, 292 F. Supp. 2d 198, 211 (D. Mass. 2003).[43]

C. *Intentional misrepresentation.* We view Brewster's claim that Blue Mountain made intentional misrepresentations at the December 18 meeting to induce Brewster to enter the contract with respect to GenCorp as exceedingly thin, and were we reviewing the facts de novo, ultimately unpersuasive.[44] The question before us on the issue, however, is whether "anywhere

---

[43]As discussed above, Blue Mountain's argument that the December 18, 1998, agreement is not enforceable because no writing contained a specific quantity term (see G. L. c. 106, § 2-201[1]), is without merit, since the agreement was essentially a requirements contract that not only could be reasonably measured by Brewster's historic purchases of GenCorp product from Blue Mountain's predecessor, but also could be deemed to cover Brewster's actual, ongoing good faith requirements for GenCorp products, which adequately sufficed as a quantity term. See G. L. c. 106, § 2-306(1); *Gestetner Corp.* v. *Case Equip. Co.*, 815 F.2d 806, 811-812 (1st Cir. 1987); *Boyle* v. *Douglas Dynamics LLC*, supra at 211, and cases cited. See notes 37-39, *supra*.

[44]At the close of Brewster's case-in-chief, the trial judge considered directing a verdict for Blue Mountain on the intentional misrepresentation claim because she had doubts that the evidence was sufficient to prove intentional, rather than merely negligent, misrepresentation (which Brewster neither pleaded nor argued). The judge ultimately decided to leave the decision to the jury.

in the evidence . . . a reasonable inference could be drawn [by the jury] in favor of the plaintiff." *Tufankjian* v. *Rockland Trust Co.*, 57 Mass. App. Ct. at 178 n.9. Viewed in that light, the record contains sufficient evidence to allow the jury to find that Blue Mountain intentionally deceived Brewster at the December 18 meeting.[45]

Brewster argues that its evidence (essentially the testimony of its officers) demonstrated that Blue Mountain made three material misrepresentations at the December 18 meeting that it knew were false and would induce Brewster to make detrimental business decisions. First, Blue Mountain promised to be "up and running" and producing GenCorp product for Brewster at its Toronto-based plant by March 1, 1999, all the while knowing (as Wood testified at his deposition) that it would be June, 1999, at least three months later, before such productivity would be effected. Second, Blue Mountain assured Brewster that it had a warehouse ready to accept GenCorp's inventory at the time of their agreement, that it would transfer inventory from GenCorp's Mississippi plant to Toronto by March 1, 1999, and that Brewster would consequently have continuous access to inventory throughout the transition. Third, Blue Mountain promised to keep two press machines running at GenCorp's plant in Mississippi during the transition period to fill Brewster's orders. Brewster contends that its evidence established that these false promises were critical because its business depended on promptly filling

---

[45]Whether Blue Mountain's statements were actionable was a question of fact for the jury. *Donovan* v. *Mac-Gray Co.*, 358 Mass. 813, 813 (1970). Although the Supreme Judicial Court has recognized that "false statements of opinion, of conditions to exist in the future, or of matters promissory in nature are not actionable," *Yerid* v. *Mason*, 341 Mass. 527, 530 (1960), statements about future events concerning the conduct of a business "may be actionable as misrepresentations when 'the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentation relate.' " *Millen Indus., Inc.* v. *Flexo-Accessories Co.*, 5 F. Supp. 2d 72, 74 (D. Mass. 1998), quoting from *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 80 (1991). For the claim of intentional misrepresentation to survive here, it must also be shown that the jury could rationally find that at the time Wood made the statements Brewster relies on, he had no intention of following through on them; mere nonperformance would not be enough. See *Galotti* v. *United States Trust Co.*, 335 Mass. 496, 501 (1957).

customers' orders, so that it in fact relied on them to its detriment.[46]

Brewster's claims that Blue Mountain knowingly made false promises regarding its transfer and warehousing of GenCorp inventory[47] and its maintaining two functioning presses at Gen-Corp's Mississippi factory during the transition period[48] do not amount to intentional misrepresentation[49] because there is simply no evidence in the record that Wood or anyone else at Blue

[46]Timely and uninterrupted service was so crucial to Brewster that it maintained its own supply of GenCorp inventory, in addition to ordering from Blue Mountain's existing supply of product, in order to avoid excessive back orders. In reliance on Blue Mountain's assurances, Brewster began placing orders for GenCorp product within days of the December 18 agreement and thereafter continued to promote GenCorp lines, kept thousands of GenCorp sample books in the retail market, accepted thousands of orders from its retail customers, and placed thousands of orders with Blue Mountain, none of which were rejected. The detriment to Brewster's business from Blue Mountain's admittedly poor service in filling GenCorp orders became evident soon after the December, 1998, agreement.

[47]As to the warehouse promise, Brewster's only significant evidence on this point, the testimony of GenCorp's Kelly that Blue Mountain "probably" did not have an available warehouse at some specified time, was speculative hearsay at best. The issue is whether Blue Mountain intentionally deceived Brewster at the December 18 meeting, not whether it actually had a storage facility available during the transition period. In addition to Kelly's testimony that he had to beg to get Blue Mountain to take its newly acquired inventory, Blue Mountain's Hooker admitted that he failed to survey the acquired inventory prior to meeting with Brewster and promising he would make a physical inventory by March 1, 1999. Had Blue Mountain actually surveyed the inventory prior to the December 18 meeting, it would have realized that it was incapable of transferring the bulk of the merchandise in so short a period. Blue Mountain's testimony was that as of December, 1998, it had an available warehouse ready to accept GenCorp inventory, but that GenCorp's unionized employees created impediments to the transport of inventory from GenCorp's warehouse by Blue Mountain's nonunion workers. Thus, the problem arose from the transfer of GenCorp inventory subsequent to December 18, 1998, rather than Blue Mountain's ability to store it. Brewster offered no evidence to the contrary, i.e., that Blue Mountain's shortage of inventory needed to fill orders arose prior to achieving full production in Canada, and was caused by storage difficulties that it was aware of at the time of the December 18 meeting.

[48]Brewster's president, Grandberg, testified that Wood announced to him at a January, 1999, meeting, that he no longer felt it was necessary to keep two presses running at GenCorp's plant in order to maintain satisfactory production levels. Grandberg was thus not only apprised of Wood's decision as of a date prior to any significant reliance by Brewster but also had no objection to it.

[49]There is abundant evidence on the basis of which the jury could have

Mountain knew those statements were false at the time of the December 18, 1998, meeting.

Wood's promise to Brewster at the December 18, 1998, meeting to have full production up and running on the newly acquired GenCorp presses by March 1, 1999, stands on a different footing, however, because he had testified at his earlier deposition (which was read at trial) that June 1, 1999, had been the date he anticipated for such production at the time Blue Mountain acquired GenCorp.[50] That statement alone was sufficient to justify the jury's finding of an intentional misrepresentation under the governing standards discussed above, notwithstanding Blue Mountain's contention that the statement was merely a hopeful prediction and expectation because there were customarily no guarantees regarding production dates in the wallpaper business. The jury could rationally infer that, although Wood actually anticipated June 1, 1999, for full production, he promised Brewster at the December 18 meeting a much earlier date of full production in order to secure the deal through an assurance of productive capacity sufficient to insure the reliable supply that was so important to Brewster.[51] The jury could reasonably draw that inference in light of the uncontested

found that Blue Mountain made *negligent* misrepresentations in these respects, but Brewster never pressed a claim for negligent misrepresentation.

[50]As noted in note 9, *supra*, Blue Mountain argues that Brewster misconstrued Wood's testimony from the deposition and read it out of context to confuse the jury. It asserts that June 1, 1999, was merely the date Blue Mountain intended to have all of the machinery from GenCorp's warehouse functioning in Toronto, including the two presses Wood had originally planned to keep running at GenCorp's warehouse during the transition period. Since Blue Mountain failed to designate Wood's deposition in its entirety, we cannot evaluate in any meaningful way whether the statements were taken out of context. It was, of course, Blue Mountain's burden to provide us with an adequate record to support its appellate contentions. *Wooldridge* v. *Hickey*, 45 Mass. App. Ct. 637, 641 (1998). The jury heard Wood's testimony and were able to make a not unreasonable finding (even if only one of several possible interpretations) that it amounted to an intentional misrepresentation.

[51]One might initially question whether a rational motive could be imputed to Blue Mountain for intentionally deceiving Brewster, considering that Brewster's lost GenCorp sales amounted, in essence, to lost sales for Blue Mountain. In an attempt to shed uncomplimentary light on Blue Mountain's motive, Brewster's counsel elicited testimony from Hooker that Blue Mountain had no intention of renewing its contract with Brewster after the GenCorp lines reached their discontinuation dates. In fact, Blue Mountain had arranged for other distributors to assume responsibility for distributing Sanitas and the

testimony from both parties that timely supply was critical and that customers would not wait as long as three months for an order to be filled. As Blue Mountain's Hooker testified, "people want [their wallpaper] when they buy it."

D. *General Laws c. 93A.* The jury found, without particularization, that Blue Mountain had committed an unfair or deceptive business act or practice in its dealings with Brewster[52] and that such conduct was committed "wilfully or knowing[ly]." The trial judge apparently accepted as binding the jury's findings without elaboration (except to state they were "well supported by the evidence") and awarded Brewster (which had requested treble damages) double damages and attorney's fees.[53] Blue Mountain contends that its actions, in what should be

---

other GenCorp lines in Brewster's stead after the contracted period of thirty-six months. Although there was no direct evidence that Blue Mountain intended not to renew the relationship with Brewster as of December 18, 1998, when it entered the contract, it would not have been irrational for the jury to infer from the fact that Brewster was competing with Blue Mountain at that time for the opportunity to merge with International, another wallpaper manufacturer in Canada, that any financial damage suffered by Brewster in connection with the GenCorp lines would be advantageous to Blue Mountain as a competitor for the potential International acquisition. Wood's statement to Brewster on December 18, 1998, that there would be full production on Gen-Corp in Canada by March, 1999, when he actually anticipated June, 1999, for production, was consequently sufficient to support the jury's finding.

[52]Whether particular circumstances amount to an unfair or deceptive act or practice is a question of fact. *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983). The jury did not specify what aspect of Blue Mountain's "dealings" with Brewster constituted the unfair or deceptive act or practice found, but we may confidently infer that the predicate was either the finding of breach of the covenant of good faith and fair dealing or the finding of intentional misrepresentation.

[53]There is no constitutional right to a trial by jury on a c. 93A claim. *Nei* v. *Burley*, 388 Mass. 307, 315 (1983). Nonetheless, the trial judge had the discretion to submit the c. 93A claim to the jury for their binding factfinding, *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 577-578 (1986); *Charles River Constr. Co.* v. *Kirksey*, 20 Mass. App. Ct. 333, 337 (1985), although she could, also in her discretion, have treated that jury verdict as advisory even after trial. See *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 22 n.31, cert. denied, 522 U.S. 1015 (1997). Even if it could be inferred from the judge's quoted comment that she independently adopted the jury's c. 93A finding as her own, Blue Mountain could not successfully challenge the judge's action thereon as clearly erroneous, see Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996), for the same reasons, discussed *infra*, as support the jury's c. 93A verdict. See note 60, *infra*. We note that Blue

viewed as essentially a breach of oral contract case, lacked the qualities of manipulative self-interest, oppression, coercion, or other improper motivation that could be deemed to rise to the level of a c. 93A violation, particularly since the relevant transactions involved sophisticated business parties. See, e.g., *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983) ("an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business"). Blue Mountain further argues that its conduct was not egregious enough to warrant a punitive award of multiple damages.

While Blue Mountain legally is correct in arguing that the mere breach of an oral contract, or mere negligence, without more, does not amount to a violation of c. 93A[54] (as the judge correctly instructed the jury), its assertion is beside the point. Under the jury's findings — which, as noted above, have rational support in the evidence — something more *was* here involved; namely, the finding of intentional misrepresentation (or common law fraud or deceit), which is sufficient foundation for a finding of a c. 93A violation in a business context. See, e.g., *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 848-849 (1983); *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 779-780 (1986); *Heller Financial* v. *Insurance Co. of N. America*, 410 Mass. 400, 408-409 (1991); *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979); *Lynn* v. *Nashawaty*, 12 Mass. App. Ct. 310, 311 (1981); *Bump* v. *Robbins*, 24 Mass. App. Ct. 296, 311-312 (1987); *Chamberlayne Sch. & Chamberlayne Jr. College* v. *Banker*, 30 Mass. App. Ct. 346, 347 (1991); *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. 610, 620 (1994); *Marshall* v. *Stratus Pharmacies, Inc.*, 51 Mass. App. Ct. 667, 677 (2001); *Ameripride Linen & Apparel Servs., Inc.* v. *Eat Well, Inc.*, 65 Mass. App. Ct. 63, 67 (2005).[55]

Additionally, the jury's finding that Blue Mountain breached

Mountain does not challenge the amount of the judge's attorney's fee award, but rather urges elimination of the fee in toto, on the ground that its conduct should not have been found violative of c. 93A.

[54] See, e.g., *Poly* v. *Moylan*, 423 Mass. 141, 151 (1996); *Madan* v. *Royal Indem. Co.*, 26 Mass. App. Ct. 756, 762-763 (1989).

[55] Even negligent misrepresentation can be a proper basis for the imposition

the covenant of good faith and fair dealing — a finding it does not challenge on appeal — would provide an independently sufficient basis for the finding that it violated c. 93A. See *Massachusetts Employers Ins. Exchange* v. *Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995); *Wasserman* v. *Agnastopoulos*, 22 Mass. App. Ct. 672, 680 (1986).

Further, the issue of c. 93A violation was not restricted (as was the intentional misrepresentation count) to the events of December 18, 1998. The jury could also have permissibly relied on additional facts in the record that could be viewed as exacerbating the unfairness of the original misrepresentation, including (a) Blue Mountain's having given Brewster false hope that the crisis-producing GenCorp supply problems had been resolved (in a public relations letter sent to Brewster's customers in June, 1999, which stated that "[w]e have worked day and night to solve these problems and are pleased to announce they are now behind us," even though a former Blue Mountain operations manager testified at his deposition, which was read at trial, that he did not recall Blue Mountain resolving any problems at that time but rather that the back order problem continued through to September, 1999, and the production dates Blue Mountain provided continued to be unreliable)[56]; (b) Blue Mountain officers and personnel could rarely be reached and did not return Brewster's frequent telephone calls and letters requesting resolution of the delay problems with any regularity, often took weeks to respond to Brewster's inquiries, and sometimes stopped communicating at all, with no adequate or even plausible explanations for their lack of responsiveness; and (c) Blue Mountain's failure to disclose to Brewster (as of

---

of c. 93A liability. See *Glickman* v. *Brown*, 21 Mass. App. Ct. 229, 235 (1985); *Golber* v. *BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 261 (1999).

[56]Similar unfulfilled assurances of resolution of the delay problem by Blue Mountain that the jury were entitled to consider as relevant to the c. 93A claim were given by Wood and Hooker in late March, 1999, and May, 1999. The jury were free to discredit Blue Mountain officials' trial testimony to the effect that they worked hard to rectify their consistently poor service on the GenCorp lines and had every intention of filling all of Brewster's orders, particularly in light of Hooker's acknowledgment that the back order problems persisted "late in[to] the third quarter" of 1999 and that Blue Mountain was not "all caught up" until "the end of December," 1999.

December 18, 1998, and for several months thereafter) that a condition of Blue Mountain's pending merger deal with International was that Brewster (who was a rival in the bidding for International) would be terminated as a distributor of certain nonGenCorp products, and that Blue Mountain had no intention of renewing Brewster's GenCorp distributorship (and had already designated other distributors to take over its GenCorp distribution rights when the current lines were discontinued). On the entirety of the record evidence, the jury were therefore entitled to find, at the very least, that Blue Mountain had violated c. 93A by misleading Brewster into acting differently than it would otherwise have done, to its financial detriment.[57]

Whether that c. 93A violation merited the award of multiple damages, as Brewster insists and Blue Mountain challenges, is an interesting question as to which one might differ with the jury and the judge, on the rationale of *VMark Software, Inc.* v. *EMC Corp., supra.* We see that case as having remarkably similar facts, but it involved an outcome-determinative procedural distinction that undermines Blue Mountain's reliance on it.[58] Unlike the *VMark* case (which reviewed a judge's findings at a bench trial and vacated the judge's ultimate finding as to c. 93A for being inconsistent with the judge's subsidiary findings, *VMark Software, Inc.* v. *EMC Corp.,* 37 Mass. App.

---

[57]Failure to disclose a material fact that causes a party to act differently with respect to a transaction than it otherwise would have has been held sufficient to support a finding of c. 93A liability in a business context. See *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 777 (1980); *Homsi* v. *C.H. Babb Co.,* 10 Mass. App. Ct. 474, 479-480 (1980); *Sargent* v. *Koulisas,* 29 Mass. App. Ct. 956, 958 (1990); *Lily Transp. Corp.* v. *Royal Institutional Servs., Inc.* 64 Mass. App. Ct. 179, 186 (2005). Whether Blue Mountain had a duty to disclose the terms of its proposed International transaction, which objectively could have had adverse financial consequences for Brewster (see note 51, *supra*), was not addressed at trial (Wood having testified only that nondisclosure was justified because the negotiations were confidential and unrelated to the GenCorp lines), nor has it been argued on appeal. Cf. *Wolf* v. *Prudential-Bache Securities, Inc.,* 41 Mass. App. Ct. 474, 476-478 (1996).

[58]As Blue Mountain has argued, the *VMark* case stands for the proposition that even intentional misrepresentations do not automatically trigger multiple damages, at least when Blue Mountain's conduct at issue was not that of one who was "deliberately deceptive and entirely disdainful of his commitments," but rather reflected the acts of a party who was "misguidedly insincere but fundamentally well-intentioned." *VMark Software, Inc.* v. *EMC Corp.,* 37 Mass. Ct. at 623-624.

Ct. at 617), we have before us a jury finding as to Blue Mountain's wilful and knowing c. 93A violation. That finding was based on the jury's plausible and not irrational view of the evidence, which we cannot disturb under the applicable standard of review.[59] So long as that finding stands, an award of multiple damages ineluctably flows from the plain language of the statute.[60]

E. *Tortious interference.* The deferential standard of review of jury verdicts does not insulate the finding that Blue Mountain tortiously interfered with Brewster's advantageous relationships with its customers, which we reverse because Brewster's evidence failed to establish the elements necessary to support this claim.

"There are four elements required to establish interference with advantageous business relations: (1) the plaintiff has a business relationship for economic benefit with a third party, (2) the defendants knew of that relationship, (3) the defendants interfered with that relationship through improper motive or means, and (4) the plaintiff's loss of the advantage resulted directly from the defendants' conduct." *McNamee* v. *Jenkins*, 52 Mass. App. Ct. 503, 508 (2001). The "improper motive or means" element requires proof of the defendant's "actual malice," i.e., a "spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Shea* v. *Emmanuel College*, 425 Mass. 761, 764 (1997), quoting from *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992).

Brewster failed to make a case that would permit the jury to find either actual malice or "loss of the advantage." Brewster offered no evidence establishing that any specific customers terminated their dealings with it because of Blue Mountain's unreliable service on GenCorp lines, nor did it present any

---

[59]Even had the finding as to Blue Mountain's wilful or knowing violation been made by the judge in a bench trial, we would uphold it as supported by a reasonable view of the evidence, including all rational inferences therefrom. See *Kitner* v. *CTW Transport, Inc.*, 53 Mass. App. Ct. 741, 747-748 (2002).

[60]See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 475 (1991). The fifth paragraph of G. L. c. 93A, § 11, states: "If the court finds for the petitioner, recovery *shall be* in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that . . . the act or practice was a willful or knowing violation . . . ." (emphasis added).

documentation indicating that any customers cancelled their orders on that account. Moreover, as discussed below, Brewster failed to mitigate its damages and maintained no records of whether customers who cancelled orders for GenCorp wallpaper because of undue delay selected substitute Brewster products, which was conceded to be a common occurrence.

Finally, Brewster's evidence failed to demonstrate that Blue Mountain's actions challenged in this litigation were entirely malevolent and unrelated to any legitimate corporate interest. Even assuming that the facts revealed Blue Mountain to be motivated by a desire for financial or competitive gain at Brewster's expense, or by its officers' personal dislike of Brewster and its personnel for whatever reason, no inference of the requisite spiteful and malignant ill will would be warranted. See *United Truck Leasing Corp.* v. *Geltman,* 406 Mass. 811, 817 (1990); *Boothby* v. *Texon, Inc.,* 414 Mass. 468, 487-488 (1993); *King* v. *Driscoll,* 418 Mass. 576, 587 (1994).

F. *Damages.* 1. *Net profits.* That Blue Mountain's conduct, as found by the jury, may have entitled Brewster to an award of some amount of damages did not relieve Brewster of the burden of establishing, with sufficient certainty, that such conduct in fact caused any claimed loss and the amount of that loss (in this case, its alleged lost profits on lost GenCorp and other wallpaper sales). Brewster could not leave the amount of its damages to assumption or conjecture but was obliged to introduce evidence proving its damages to a reasonable certainty. While the calculation of lost profits did not require mathematical precision, it could not be remote, speculative, or hypothetical. See *Cambridge Plating Co.* v. *Napco, Inc.,* 85 F.3d 752, 771 (lst Cir. 1996); *Augat, Inc.* v. *Aegis, Inc.,* 409 Mass. 165, 175-176 (1991); *Augat, Inc.* v. *Aegis, Inc.,* 417 Mass. 484, 488 n.4 (1994), quoting from *Lowrie* v. *Castle,* 225 Mass. 37, 51-52 (1916); Alperin & Shubow, Summary of Basic Law § 10.93 (3d ed. 1996). Evidence that enables the jury to arrive at a reasonably approximate estimate of damages is, however, sufficient. *Coady* v. *Wellfleet Marine Corp.,* 62 Mass. App. Ct. 237, 245 (2004).

Blue Mountain's principal argument, relying on *Jet Spray Cooler, Inc.* v. *Crampton,* 377 Mass. 159, 175 n.15 (1979), is that Brewster's expert, Kampner, improperly calculated lost

profits based on Brewster's gross profits. The court in the *Jet Spray Cooler* case cited *MacDonald* v. *Page Co.*, 264 Mass. 199, 206 (1928), for "the only proper rule" regarding lost profit damages — that a plaintiff can only recover lost net profits resulting from a defendant's tort or contract breach, not lost gross profits. *Jet Spray Cooler, Inc.* v. *Crampton, supra.*[61] On this record, Blue Mountain's theoretically correct position does not, however, win the day.

During his initial testimony, Kampner failed to mention net profits when explaining Brewster's lost profit damages. After Brewster rested, Blue Mountain moved for a directed verdict on the ground that Kampner had failed to make the requisite reductions from gross profits to reach reasonable net profits in his calculations. The trial judge — without objection from Blue Mountain — allowed Brewster to recall Kampner to "clarify" his calculations.[62] Kampner then briefly testified to the effect that Brewster's net profits for the years 1999 and 2000 in effect were the same as its gross profits because the company's overhead expenses were fixed.[63] Blue Mountain's counsel inexplicably declined to cross-examine Kampner on his

---

[61]See *Magnolia Metal Co.* v. *Gale*, 189 Mass. 124, 132-133 (1905) (error not to instruct jury that the plaintiff in a breach of contract and misrepresentation case was entitled only to net profits and was required to deduct from the contract price, or the gross profit that would have accrued under the contract, "such expenses as the plaintiff would have been subjected to in carrying out the contract"; not to do so "would be putting the plaintiff in a better position than it would have occupied if the contract had been fully performed"); *Ricky Smith Pontiac, Inc.* v. *Subaru of New England, Inc.*, 14 Mass. App. Ct. 396, 426-427 (1982) ("The prevailing rule is that damages for . . . [claimed lost] profits [in a business tort case] must be reduced by any direct expenses that would have been incurred in making the lost sales . . . [i.e.,] the plaintiff was entitled to recoup damages in the form of net profits . . . [after] the plaintiff's deduction of 'variable expenses' from gross profits").

[62]Blue Mountain's appeal does not challenge the trial judge's allowance of Kampner to return to the stand to massage his testimony.

[63]Blue Mountain argues on appeal that Kampner did not qualify as an expert in the field. However, this objection was not made at trial and fails in any event. See *Rombola* v. *Cosindas*, 351 Mass. 382, 386 (1966) (a witness's opinion "would . . . be admissible as evidence of the extent of damages if his qualifications as an expert witness are accepted by the trial judge"). Blue Mountain has failed to show that the trial judge abused her broad discretion in implicitly ruling that Kampner qualified as an expert on the strength of his thirty-nine years of experience in the wallpaper industry, see *McLaughlin* v. *Board of Selectmen of Amherst*, 422 Mass. 359, 362-363 (1996) ("practical

"clarification" testimony, and thus failed to probe whether he had factored variable expenses (which he had never mentioned) into his calculation of Brewster's lost profits.[64]

As skeptical as we may be that Kampner's explanation made economic sense (given, for example, the fact that Brewster had over $1.25 million of "freight and delivery" expenses in 1999 and, as a matter of common sense, had to incur varying handling expenses in supplying its scattered retail customers depending on the volume of their orders and the distance materials had to be shipped), Kampner's testimony that Brewster's gross profits equaled its net profits after accounting for fixed overhead and "additional" expenses nonetheless provided a sufficiently (if minimally) rational basis for the jury's finding that Brewster adequately proved its lost net profits to the requisite certainty.[65]

2. *Mitigation.* Blue Mountain is on firmer ground in pointing

knowledge" and "sales experience" in the field qualified witness as expert); and the jury were free to credit his testimony in its entirety.

[64]During Kampner's recalled testimony, he used the term "additional expenses" when calculating net profits: "The net profit *typically is* - from the gross profit you deduct any overhead expense or intended expenses of that. After you have paid these *additional expenses*, you end up with a net profit" (emphasis added). Blue Mountain argues that Kampner went on to define overhead expenses as fixed expenses such as rent, heat, and power, and that overhead expenses do not include variable expenses such as the cost of freight and delivery. Blue Mountain's trial counsel did not, however, make any effort to clarify Kampner's rather murky clarification; and, in light of the applicable standard of review, we cannot say that it would have been irrational for the jury to have construed the term "additional expenses" to include variable expenses, a concept they had heard discussed in the testimony of Blue Mountain's damages expert, Joseph Finn, who had also conceded that he himself had once testified in a case that in certain circumstances gross profits might be the same as net profits.

[65]The jury were expressly instructed by the judge that Brewster was entitled to recover only its net, and not its gross, lost profits. It has been held, if only rarely, that recovery of gross profits in a breach of contract or business tort context is acceptable when gross profits are essentially the same as net profits, i.e., if there is no additional cost required to realize the profits. See, e.g., *Eastern Advertising Co.* v. *Shapiro,* 263 Mass. 228, 232-234 (1928). We need not address whether Kampner's calculations for lost profits on the GenCorp lines were correct. The sole issue before us in deciding whether to uphold the jury's damage award is whether Kampner presented sufficient evidence to permit the jury to find that the amount of Brewster's lost profits damages had been proven to a reasonably approximate certainty. Put another way, when an appellant challenges a jury verdict on the ground of excessive damages, as Blue Mountain is essentially doing here — a challenge that the trial judge

out Brewster's failure to have discharged its obligation to mitigate damages caused by Blue Mountain's breach of contract.[66] "[A] party cannot recover damages for loss that he could have avoided by [such] reasonable efforts . . . as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Restatement (Second) of Contracts § 350(1) comment b (1981). See *Maynard* v. *Royal Worcester Corset Co.*, 200 Mass. 1, 6 (1908); *Delano Growers' Coop. Winery* v. *Supreme Wine Co.*, 393 Mass. 666, 684 (1985); *National Medical Care, Inc.* v. *Zigelbaum*, 18 Mass. App. Ct. 570, 581 (1984). See also *Cooney Indus. Trucks, Inc.* v. *Toyota Motor Sales, U.S.A., Inc.*, 168 F.3d 545, 546 n.1 (1st Cir. 1999). Blue Mountain, as the party in breach, bore the burden of demonstrating that Brewster did not make reasonable efforts to mitigate the damages stemming from any breach of contract. *American Mechanical Corp.* v. *Union Mach. Co. of Lynn, Inc.*, 21 Mass. App. Ct. 97, 103 (1985). Blue Mountain effectively did so by showing the possibility (if not probability) of Brewster's ability to engage in substitute transactions when GenCorp products were unavailable, thereby shifting the burden to prove mitigation back to Brewster.[67]

On cross-examination, Kampner was asked: "You have no

---

rejected, in her broad discretion, in denying Blue Mountain's directed verdict motions — "an appellate court should intervene only if the damages were greatly disproportionate to the injury proved or represented a miscarriage of justice." *Egan* v. *Holderman*, 26 Mass. App. Ct. 942, 944 (1988), and cases cited. Blue Mountain, having forgone the opportunity to do so by further cross-examining Kampner, did not establish such disproportion or injustice as to Brewster's lost profits claimed at trial, and the jury could reject as not creditable Blue Mountain's own expert testimony criticizing Kampner's calculations.

[66]The damages that Brewster sought under its principal claim for breach of contract were not distinguished from those proximately flowing from any of its other theories of liability, and the judge properly instructed the jury against awarding cumulative recovery ("the plaintiff is only entitled to recover once, not for various infractions of the different counts"), as well as on Brewster's obligation to mitigate damages. As noted earlier, the jury did not assign their damage verdict to any particular count of the complaint but in fact received relevant evidence only in connection with Brewster's claimed lost profits resulting from Blue Mountain's breach of its December 18, 1998, agreement. Brewster makes no argument that its claimed contractual damages were less than those under any of its other counts.

[67]Blue Mountain could not offer independent proof on this point (other than

way of knowing . . . if a customer cancels an order [for a Gen-Corp product because of supposed dissatisfaction with delay in obtaining the GenCorp product], whether they've picked another [nonGenCorp] Brewster product in place of that order?" To which he responded, "We wouldn't know that," but admitted that the chances were "fifty-fifty, toss of the dice," whether a customer who cancelled an order for GenCorp wallpaper would select another brand of wallpaper.[68] Despite the "fifty-fifty" likelihood that such a customer would choose a substitute product, Brewster totally neglected to document whether its customer service representatives encouraged customers to substitute other products handled by Brewster for their cancelled GenCorp wallpaper or whether customers ever actually selected such other items. Furthermore, Brewster maintained no records revealing customers' reasons for cancellation. Cf. *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. at 180 ("the uncertainty in the assessment of damages arises not from any action of the defendants, but from the inaction of the plaintiffs"). On the basis of this evidentiary gap in the record (even without the others discussed below), the case must be remanded to the trial

its own expert, Finn, testifying to the "fifty per cent" likelihood of substitute transactions) because Brewster, in response to Blue Mountain's discovery request directed at the substitute sales issue, produced nothing, insisting that it kept no such records.

[68]As mentioned in the preceding note, Blue Mountain's expert, Finn, also testified to a fifty percent substitution probability. Brewster makes a somewhat inconsistent response regarding mitigation. It argues that the GenCorp wallpaper was too unique to substitute because of its quality, e.g., being fabric-backed; yet it does not attempt to explain why a delay in shipment would cause a customer to cancel an order for such a unique or irreplaceable product. (When prodded at trial, Brewster's witnesses' responses were undocumented speculation that customers grew frustrated with the wallpaper industry and may have switched to paint.) Brewster also asserted at trial — again without corroborative evidence — that the distinctive wallpaper patterns also made it difficult to mitigate. For example, a customer who ordered wallpaper designed for a dining room would not substitute with a selection from a bathroom line. No evidence of such customer constraints was even attempted to be proved. Contradicting his own contention that GenCorp product was irreplaceable, Kampner testified, as indicated, that there was a fifty percent chance that a customer who cancelled a GenCorp order might select a substitute. This significant opportunity for a successful substitute transaction was sufficient to warrant an effort on Brewster's part to discharge its duty to mitigate its damages.

court on the issue of damages. Compare *National Med. Care, Inc. v. Zigelbaum*, 18 Mass. App. Ct. at 581-582.[69]

3. *"Taint" damages.* Not only must a plaintiff prove lost profits with a reasonable degree of certainty and without speculation, but it has also long been our law that, to be recoverable, such damages must have been reasonably foreseeable as a natural and probable result of a breach of contract at the time the contract was made. See *Hadley v. Baxendale*, 156 Eng. Rep. 145, 151 (1854); *Hawkins v. Jamrog*, 277 Mass. 540, 543-544 (1931); *Abrams v. Reynolds Metals Co.*, 340 Mass. 704, 708-709 (1960); Restatement (Second) of Contracts § 351(1), (3) (1981). Although Brewster provided sufficient evidence to establish that it suffered some measure of lost profits on the GenCorp lines for the years 1999 and 2000, it failed to demonstrate the foreseeability of its so-called "taint" damages, i.e., its claim that Blue Mountain's breach of contract caused lost sales of nonGenCorp products in stores that carried both GenCorp and nonGenCorp wallcoverings. Nor did Brewster offer any evidence of causation, beyond conclusory assertion, that linked the breach to lost sales of nonGenCorp product.

Brewster argued at trial that its inability to fill customer orders of GenCorp product in a timely fashion "tainted" its sales on nonGenCorp lines (which Kampner testified amounted to nearly $2.8 million in lost sales. Its evidence of the supposed taint was an exhibit purporting to show that sales in stores that sold GenCorp and nonGenCorp wallpaper decreased by approximately $5 million in 1999, whereas sales in stores that did not sell GenCorp products increased by almost ten percent. Brewster's

---

[69]Although Blue Mountain seeks to expunge the damages portion of the verdict entirely, we are reluctant to interfere so violently with a jury verdict that, even in the amount found, has not been shown (see note 66, *supra*) to be unduly disproportionate or to represent a miscarriage of justice (cf. *MacCuish v. Volkswagenwerk A.G.*, 22 Mass. 380, 398-399 [1986]); at least in light of the sufficiency of Brewster's proof of *some* lost profits in consequence of Blue Mountain's breach of contract and of Blue Mountain's expert's effective acknowledgment that a substantial number of lost sales could not be mitigated by substitute transactions — this against the background of judicial reluctance to impinge on the "sacred" right to trial by jury in civil cases (see art. 15 of the Massachusetts Declaration of Rights; cf. *Augat, Inc. v. Aegis, Inc.*, 417 Mass. at 491), and the long-standing principle that "an element of uncertainty in the assessment of damages is not a bar to their recovery." *H.D. Watts Co. v. American Bond & Mortgage Co.*, 267 Mass. 541, 554 (1929).

only evidence that Blue Mountain's breach was actually the cause of taint damages was Grandberg's and Kampner's conclusory testimony (based on unattributed hearsay reports from Brewster's customer service department) that unidentified angry customers had taken Brewster's sample books off their shelves. That evidence was not, however, probative of causation. Brewster neither called any customers who sold both GenCorp and nonGenCorp products and could ascribe lost sales to Blue Mountain's breach, nor introduced a single original document reflecting such a consequential relationship.

Moreover, Brewster presented no evidence in support of its taint exhibit that established that the two categories of stores being compared operated under such similar market, financial, and competitive conditions that their sales performances could be meaningfully compared; and, as mentioned above, it failed to document customers' reasons for cancelling their GenCorp orders or to record any information regarding substitute sales. All this made it impossible for Blue Mountain effectively to rebut the premise underlying the "taint" theory — assumed by Brewster's witnesses but essentially unproven — that customers who cancelled their GenCorp orders would, in frustration or pique, have avoided all other products distributed by Brewster. Finally, Brewster introduced no evidence whatsoever establishing that such remote taint damages were, or could have been, reasonably foreseeable (much less foreseen) by Blue Mountain, or by anyone, at the time of the December 18, 1998, agreement.

Brewster's "taint" theory of damages amounted to nothing more than a hypothesis that invited the jury to speculate that Blue Mountain's conduct was the reason for the relative success of its products in different stores in different parts of the country, the sales performances of which could have been the product of numerous market factors entirely unrelated to Blue Mountain. Compare *Augat, Inc.* v. *Aegis, Inc.*, 417 Mass. at 488, quoting from *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. at 181 ("It was not sufficient simply to show [the plaintiffs'] projection of its sales and the historic return on total sales. . . . Many factors bear on the financial performance of a company. The plaintiffs had to show the portion of [their] losses . . . that was attributable to the defendant's misconduct . . . 'with sufficient

certainty' "). Unlike Kampner's dubious but legally sufficient explanation of Brewster's lost GenCorp profits, Brewster's case for taint damages as to nonGenCorp products was simply too attenuated and conjectural to support a jury finding awarding such damages and also necessitates a remand as to the issue of damages.[70]

4. *Diane Richmond line damages.* Disgruntled over Blue Mountain's poor service on the GenCorp lines, in December, 1999, Brewster made an anticipatory repudiation of a separate contract it had entered with Blue Mountain several months earlier for the manufacture and distribution of a new Diane Richmond line of wallpaper beginning in February, 2000. At trial, Brewster claimed and was awarded lost profits for the sixteen-month delay that was allegedly attributable to Blue Mountain in Brewster's independent launching of the Diane Richmond collection in July, 2001, as well as lost profits for the three-year shelf life of the line's sample book thereafter.

Blue Mountain makes two arguments regarding the claimed damages on the Diane Richmond line: (1) it was unjustifiable for Brewster to repudiate a contract that was distinct from the GenCorp lines, especially since, prior to the anticipatory repudiation, Blue Mountain had assured Brewster that it was prepared to begin production on the Diane Richmond line well in advance of the scheduled February, 2000, date (a fact uncontested by Brewster)[71]; and (2) even if the repudiation were justified, Brewster failed to prove any lost profits, as opposed to merely deferred profits (which represented fully mitigated damages, Brewster never claiming, much less proving, any interest or opportunity cost damages for the period between its contract repudiation and its commencement of Diane Richmond sales). We agree with both arguments.

---

[70]In proving lost profits on GenCorp products, Kampner did address certain market factors, such as Brewster's exclusive right to distribute fabric-backed wallcoverings in the profitable mid-Atlantic region, which should have increased its sales. Even without taking market factors into account, Brewster provided sufficient evidence on causation with respect to lost GenCorp sales because only Blue Mountain manufactured those lines and admittedly provided abysmal service to its customers in 1999.

[71]Blue Mountain had also significantly reduced the amount of Brewster's orders that were on back order to 10,000 rolls (from 157,000 rolls in May, 1999) by the time of Brewster's repudiation of the Diane Richmond agreement.

Kampner admitted at trial that Brewster cancelled the Diane Richmond line in December, 1999, two months prior to its anticipated introduction, solely because of Blue Mountain's poor service on the GenCorp lines. He further acknowledged that Blue Mountain had made considerable efforts to prepare for the introduction of the Diane Richmond collection and that Brewster bore no dissatisfaction with that preparation.[72] Brewster's asserted justification for its claimed Diane Richmond damages rested entirely on a letter it sent to Blue Mountain, dated August 19, 1999, which embodied the parties' agreement as to the Diane Richmond line.[73] In pertinent part, the letter (signed by both parties) stated:

> "We are still planning to launch the [Diane Richmond] collection in February 2000. . . . We expect Blue Mountain to service *this line* in a timely manner. This mean re-orders must be shipped in 6 to 8 weeks after the order is placed.

> "If we find that the service levels are not adequately maintained, Brewster will remove the [Diane Richmond] cylinders and reimburse Blue Mountain $285.00 (U.S.) per cylinder plus Freight and cost of packing & handling."

(Emphasis added). Based on this letter, however, the Diane Richmond agreement was unambiguously contingent upon Blue Mountain's acceptable future performance on the Diane Richmond line, and not on GenCorp service. Brewster's afterthought argument that its obligations thereunder were entirely contingent upon Blue Mountain's timely delivery of the GenCorp lines also violates the rule against parol evidence, see, e.g., *Dodge* v. *Bowen*, 264 Mass. 208, 213 (1928); *Sherman* v. *Koufman*, 349 Mass. 606, 610 (1965), which makes inadmissible the claimed intentions of the parties when the relevant

---

[72]Blue Mountain established, without contradiction, that it was fully prepared to begin manufacturing the Diane Richmond line several months in advance of the agreed-upon introduction date of February, 2000.

[73]See note 17, *supra*. The letter referenced an earlier June 10, 1997, writing, which was not admitted in evidence and presumably set forth the initial terms for the Diane Richmond line. At trial, Brewster characterized the August 19 letter as the "Diane Richmond agreement."

writing is unambiguous.[74] See *Crafts* v. *Hibbard*, 4 Met. 438, 452 (1842); G. L. c. 106, § 2-610(*b*), (*c*); Restatement (Second) of Contracts §§ 243, 250 (1981). On this record, Brewster made an unjustifiable anticipatory repudiation of the Diane Richmond agreement, which discharged Blue Mountain's obligations thereunder. Accordingly, Brewster should not have been awarded any lost profits on account of the Diane Richmond line, having ceased to have enforceable rights with respect to that agreement.

Even were Brewster correct in its assertion that it was justified in repudiating the Diane Richmond contract because of Blue Mountain's bad performance as to GenCorp products, it failed to comply with G. L. c. 106, § 2-609, which requires a party to a contract for the sale of goods to make a written demand for adequate assurance of due performance when reasonable grounds arise for insecurity as to the other party's performance. Although Brewster may have had reasonable suspicions concerning Blue Mountain's continued reliability as a business partner, it failed to make the requisite written demand on Blue Mountain for assurances of performance with respect to the Diane Richmond agreement but opted instead to terminate the contract unilaterally, prematurely, and inexcusably.

Finally, even were Brewster entitled to some measure of damages with respect to the Diane Richmond line, its presentation suffered from the same defect as infected its lost profits calculations — a failure to mitigate. Kampner conceded that there were other companies capable of manufacturing the Diane Richmond line at the time Brewster repudiated the contract with Blue Mountain, but Brewster voluntarily chose to delay production for sixteen months until its own newly-acquired subsidiary, International, could produce the line.[75] Brewster presented no

---

[74]At trial, Brewster offered Grandberg's testimony to the effect that its purpose in entering the Diane Richmond contract was to become a higher priority customer to Blue Mountain so that it would receive better service on the GenCorp lines. Although parol evidence may be used to clarify a writing with latent ambiguities, Brewster has not argued that the August 19 letter was ambiguous.

[75]Blue Mountain conceded that, were Brewster's repudiation of the Diane Richmond agreement deemed valid, Brewster would be entitled to the interest on the net profits, if any, it could prove were lost by reason of any unavoidable delay in beginning to market the Diane Richmond line.

evidence whatsoever of any efforts at reasonable mitigation in these circumstances.

III. *Disposition.* The judgment on the jury's verdict with respect to the count of tortious interference with Brewster's business relationships is reversed. The judgment on the remaining verdicts is affirmed. The award of damages (as well as the trial judge's order doubling those damages) are vacated, and this case is remanded to the Superior Court for proceedings with respect to damages consistent with this opinion.

*So ordered.*